State *v.* Willis.

<hr />

THE STATE *vs.* BENJAMIN R. WILLIS.

Third Judicial District, Bridgeport, Oct. Term, 1898.  ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, JS.

Statements of the accused in the nature of a confession are admissible in evidence, upon the ground that a party's conduct in respect to the matter in dispute, whether exhibited by acts, speech or writing, which is clearly inconsistent with his contention, is a fact relevant to the issue. Such statements, however, are not in themselves testimony, but are matters to be proved as independent facts, the pro-

State v. Willis.

bative force of which must depend upon the circumstances of each particular case.

The circumstances under which incriminating statements of the accused were made and upon which their admissibility depends, is a matter for the determination of the trial judge. The mere fact that some hours prior to an alleged confession of the accused to the sheriff, promises and inducements had been held out to him by another officer, does not necessarily and as matter of law render the confession unreliable and inadmissible in evidence. It may appear, as was found by the trial judge in the present case, that notwithstanding such inducements the confession was uninfluenced by them, but was freely and voluntarily made and with the knowledge upon the part of the accused that his statements might be used against him.

The discretion of the trial judge in receiving a confession involves a question of duty, and is therefore reviewable; and a clear case of abuse may furnish ground for a new trial.

A statement by one accused of murder, as to what disposition he had made of the watch of the decedent, in connection with evidence identifying the watch and that it was found at the place indicated, is admissible, no matter what promises had been previously made.

Although an opinion formed from reading newspaper articles may, in a sense, be said to be one which requires evidence to remove, yet it does not disqualify one as a juror unless it has resulted in a settled prejudice or hostility to the prisoner, which requires evidence to dislodge before the testimony can be heard and fairly weighed.

Argued November 10th—decided November 29th, 1898.

INDICTMENT for murder in the first degree, brought to the Superior Court in Fairfield County and tried to the jury before *Thayer, J.;* verdict and judgment of guilty, and appeal by the accused for alleged errors in the rulings of the court in impaneling the jury and in the admission of evidence. *No error.*

The facts necessary for presenting these questions were found by the trial court. The State offered testimony tending to prove the following facts, to wit: That on the evening of December 17th, 1897, at about six o'clock, two men wearing black masks entered the dwelling-house of David S. R. Lambert in the town of Wilton; that at the time they entered, the wife of Mr. Lambert was alone in the house, the family consisting only of Mr. and Mrs. Lambert; that the men entered the dining-room where Mrs. Lambert was, and one placed a black hand-bag, which he carried, on the floor, and

stood with his back to the door, while the other said: "Where is the money; don't say a word; point that gun straight at her;" that the same one who spoke also asked her several other questions, spoke to her several times, and spoke to his companion in her hearing; that the men chloroformed, bound and gagged her; that when she came to she found her husband lying on the floor apparently lifeless; that the defendant had been an inmate of the household of said Lamberts as a pupil in a school conducted by Mr. Lambert between the years 1886 and 1890; that Mrs. Lambert had seen him and conversed with him on two occasions since 1890, and was familiar with his voice, and that she recognized the voice of the man who spoke to her as the voice of Benjamin R. Willis, the defendant; that Mr. Lambert, when found, had six bullet wounds upon his body and was unconscious; that he never regained consciousness, and died on December 22d, 1897; that his death was caused by one of the bullet wounds; that three bullets were found in the body of Mr. Lambert, five in the walls and upon the floor of the dining-room, and one in the bed where Mr. Lambert was placed shortly after his discovery; that the house was ransacked and various articles of personal property were taken from the premises or person of Mr. Lambert, among them a gold watch with chain attached, and that a gold watch and chain which were produced in court by the State were the ones taken; that Mr. Lambert went to Norwalk at about one o'clock of that day, with his horse and square box wagon; that at about 4:40 o'clock that afternoon, Willis, the defendant, and a companion identified as one Brockhaus, got on a tramway car at South Norwalk and went to Winnepauk, the terminus of the road, which is about three miles from the Lamberts' house, arriving at Winnepauk about 5:05 o'clock; that one of them had a small black hand-bag at the time; that after the entry of the Lambert premises, two men were seen with the team belonging to Mr. Lambert going from Wilton toward South Norwalk; that one was driving and this person was the defendant; that the horse and wagon were found abandoned near the depot at South Norwalk about half past eight that

evening, after the departure of the 7 : 55 o'clock train for New York; that a black mask was in the wagon at the time it was thus found, and that the axle of the wagon had wound about it a piece of wire attached to a post, and that both the post and the wire were part of a fence around the Lambert yard which was torn down on the night in question ; that the defendant, and another man identified as Brockhaus, boarded the 7 : 55 o'clock train at South Norwalk on the same evening and rode to New York.

· After introducing this testimony the State offered in evidence a statement made by the defendant to a Mr. Diehl, superintendent of Pinkerton's detective agency in New York, in the presence of Sidney E. Hawley, sheriff of Fairfield county, and John W. Rumsey, a stenographer in the employ of said agency, who took down the statement. Said statement contained a detailed account of planning the Lambert robbery with one Max Brockhaus ; of going with Brockhaus to South Norwalk on the morning of the murder, of going to the Lambert house, of chloroforming and binding Mrs. Lambert, of the arrival of Mr. Lambert and his murder, of ransacking the house and taking the contents of Lambert's pockets, including the gold watch and chain, of their escape with Lambert's horse and wagon to South Norwalk and then to New York, and of their wanderings since the murder up to the time of the defendant's arrest in Columbus, Ohio. The details of what took place at South Norwalk and at Lambert's house corresponded in all essential particulars with the facts as proved by the State upon the trial.

Before offering this confession in evidence the State had proved that at the time it was made, no threats, promises or inducements were made or held out to induce the defendant to make the statement, and that before he made it he was cautioned by Mr. Diehl that any statement which he might make might be used against him.

The defendant's counsel objected to the admission of said statement, upon the ground that the same was made by the defendant while under arrest for the crime for which he was on trial, and because certain promises and inducements were

made and held out to him and threats made to him by Pinkerton agents and detectives before his arrival in New York, while at Columbus, Ohio, where he was apprehended before indictment, and en route from Columbus to New York; and requested that the State be required to produce the detective to testify as to what was said, and that the accused be called to testify. The State was unable to produce the detective without delaying the trial for several days. The jury having retired to the jury-room, by direction of the court, made at the request of counsel for the defendant, said counsel, with the consent of the attorney for the State, was permitted to read a statement of what occurred after the apprehension of the accused and his arrival in New York, upon which counsel based their said objection. Said statement had been prepared by the accused for his counsel, and was read as a statement of what the accused and the detective named would testify to if placed upon the witness stand. Said statement was as follows: —

"I was taken down stairs (this was in Columbus) and locked up for about an hour, and was taken up stairs again to the chief's private room. There were present the chief of police, the Pinkerton agency superintendent and another man. The superintendent said: 'You don't know me, do you?' I said: 'No, sir.' 'Well, I am superintendent Wing, of Pinkertons.' The superintendent asked me: 'What is your name?' He says: 'Well, you are arrested for the murder of David S. R. Lambert of Wilton, Connecticut.' 'I don't know anything about it, sir.' I was then locked up until after lunch, when I was again brought before the chief and superintendent in their private rooms. The superintendent opened the conversation: 'Now there is no use in denying it, for there is your picture.' I said: 'Yes, sir, that is my name, B. Willis.' 'I knew it,' said the superintendent. 'Do you know Brockhaus was caught in Chicago?' 'No, sir.' 'Well, he was arrested Tuesday. Here is a piece from the paper. Do you wish to see it?' I do not remember what it said. 'Now, Ben,' said the superintendent, 'if you tell the chief and myself the whole thing, how it was done, it will

make it a good deal easier for you.' The superintendent said: 'It is right; it will make it go easier if you tell the whole thing.' I said: 'I don't know anything about it, sir.' I was then taken down stairs by the chief. On the way down he said: 'Which one of you did the shooting?' I said: 'I know nothing about it.' I can't say how long I was locked up, but I felt so bad about being arrested. Kotch came down to ask me if I would go to New York. They called up the Penn. R. R. and found a train left there for New York at 8:10 P. M. I was then taken into another room, stripped and searched, then locked up until 7 P. M., when Kotch, or Crouch, came down and took me up stairs, where Crouch drew an agreement for me to sign. It read something like this: 'I, the undersigned, Benjamin Willis, am willing to go from here, Columbus, Ohio, to New York.' Then I sat on the inside of the seat, and he (the detective) on the outside. I was crying to think how this would break my mother's heart, when Kotch said to me: 'Don't be down in the mouth, Ben, as you have a good chance yet to get out of this. Brockhaus has already thrown up his guts in Chicago, and then, the ticket agent at South Norwalk recognized his picture as the fellow who bought tickets there on the 17th of December for Harlem River; but they were not sure of you. Don't you see the point? There is only Mrs. Lambert says she can recognize your voice. Now, if you turn State's evidence, and put it on him, you can save yourself. That is the reason I am rushing you on to New York, so that Brockhaus won't get the chance to turn on you. I am going to take you to our office down town, where we both can take a bath, and after a rest you can tell the whole thing to the superintendent.' I then asked him if he thought I could see my mother. He said: 'Yes, I will 'tend to that for you, and see that you get a clean collar.' I then asked him, if I would have to go right up to Connecticut after I was through at their office. He said: 'I don't think you will have to until Monday.' We were leaving Philadelphia, Pa., when we went back to the smoking car, and remained there until after we left Trenton. We then went to our seats again to get our things together.

He then said : ' Ben, you will find the superintendent a fine man, so don't lie to him, and he will see that everything comes out all right for you.' When we arrived in Jersey City, sheriff Hawley of Bridgeport, and detective Wilkes of New York, were waiting for me. They took me straight to the Pinkerton office, and superintendent Hyde, I believe his name is, said ' How do you do, Willis ? ' ' I said : ' How do you do, sir ? ' He then asked me, after he had spoken to Kotch, if we had had our dinner. I said, ' No.' Then they took off that cuff on my foot and the sheriff gave me a cigar. There were present the sheriff, superintendent Hyde, the stenographer and another man. The superintendent asked me my full name, where I was born, my age, how long I had known Brockhaus, where we went on Thursday, December 16th. And then follows the statement, which I believe contains the words, ' I hereby make this statement unconditionally.' "

The court found that notwithstanding the statements aforesaid, made to the defendant in Columbus, and upon the cars before his arrival in New York, the statement made to Mr. Diehl was freely and voluntarily made by the defendant, knowing that it might be used against him, and that he was not induced thereto by any threats, promises or inducements, made to him by any one, and thereupon admitted the offered statement, and it was read to the jury. Counsel for the defense duly excepted.

For the purpose of tracing the gold watch and chain which had been produced in court and identified as those which were taken from Mr. Lambert, and which the State offered evidence to prove were redeemed from a pawn-shop in Philadelphia on April 5th, 1898, by detective Wilkes of Pinkerton's agency, and to connect the defendant with the pawning of said watch and chain, the State offered the testimony of sheriff Sidney E. Hawley, that he had a conversation with the defendant shortly after the statement to Diehl was made, and while on the way from Pinkerton's office to the Grand Central railway station in New York, in which the accused said to him that he hocked the watch and chain in Philadel-

phia, in the name of Alexander Stetson or Stetson Alexander, around the square near the depot, for twenty-five dollars. To this testimony counsel for the accused objected, for the same reason stated with respect to the statement to Mr. Diehl. The court overruled the objection for the same reasons the former objection was overruled, and defendant's counsel duly excepted.

Upon the examination of jurors touching their qualifications to act as jurors, Rufus B. Jennings, being sworn and examined on the *voir dire*, testified as follows : —

"Examined by *Mr. Fessenden.* Q. You reside in Fairfield? A. Yes, sir. Q. How long have you resided there? A. All my life. Q. What is your business? A. Farmer. Q. Do you know anything about the merits of this case? A. Nothing. Q. Have you formed any opinion as to the guilt of the accused? A. No, sir. No way to form an opinion; no reason to form any. I have read of the case. Q. You know of no reason why you cannot fairly try the prisoner on the law and the evidence? A. I don't know of any reason at all. Q. If you were satisfied from the law and the evidence the crime of murder in the first degree had been committed, would you have any conscientious scruples against enforcing the death penalty? A. No, sir.

" Cross-examined by *Mr. Lynch.* Q. Did you ever know Mr. Lambert? A. No, sir. Q. Or Mrs. Lambert? A. No, never acquainted with any of them. Q. Acquainted in Wilton? A. I don't know as I know any of them. I have no acquaintance in Wilton. Q. Have you talked about the case? A. Perhaps in my family made some remarks about it. Q. Did you at that time believe Mr. Lambert had been murdered? A. I believed what the paper said—a murder had been committed. He was the man. Q. Did you believe a murder had been committed? A. That is the impression I got from reading the papers. Q. Do you now believe a murder has been committed? A. I have no reason to believe otherwise. Q. If you went into the jury-box it would require some evidence on the part of the accused to erase that opinion? A. Yes, I should want to be satisfied there had been

State v. Willis.

no murder committed. Q. So the State would not have to prove a murder had been committed? You are satisfied now? A. From what I read I supposed a murder had been committed. If it was not true I would believe it was. Q. You would want to be shown it was not true? A. Yes. Q. You believe what you read in the papers? A. No, I believed from what I did read, the man was killed. Had no reason to think who did it or anything of that kind. Q. Did you ever hear of Willis being accused? A. I read in the papers it was thought he might have been. Q. You would go into the jury-box with the conviction a murder had been committed, and it would require evidence to remove that conviction? A. Yes, I think it would. Q. You would have no doubt about it? A. I don't know any reason why I should have, unless there was evidence to convince me there hadn't been a murder committed.

" By *Mr. Fessenden.* Q. You understand the rule governing a case of this kind, that the State must prove its case, not only the crime and the nature of it beyond a reasonable doubt, as well as the guilt of the accused? A. Yes, sir. Q. I will ask you whether the opinion or impression you have formed is such that if you were to go into the jury-box, you would require evidence, in the first instance, to remove that opinion? A. That there had been a murder committed? Q. Yes; or would you require the State to prove it beyond a reasonable doubt? A. I should want some proof of that. Q. You would want proof beyond a reasonable doubt that the murder had been committed, and the degree of the crime, and the connection of the accused with it? A. Yes, sir. Q. Is the impression you have formed from the newspapers such that you would require any evidence from the accused that a crime had not been committed there, or would you require the State to prove it beyond a reasonable doubt and that the accused was guilty, before you would find him guilty? A. Yes, I should.

" By *Mr. Lynch.* Q. While you understand the rule of law that requires the State to prove beyond a reasonable doubt every material allegation of that indictment, still you

are satisfied now a murder was committed, and it would take evidence to remove that conviction from your mind if you took a seat in the jury-box? A. Yes, I think it would. I never had any doubt but a murder was committed, from what I read. Q. You discussed it with your family? A. No, never discussed it. At the time there was excitement— Q. You had no doubt then, you have none now, but there was a murder committed? A. I had no doubt but the papers discussed it."

The defendant challenged the juror for bias, which challenge was disallowed by the court, and the defendant duly excepted.

Upon the examination of Frank J. Elwood, another of said panel, he testified substantially as juror Jennings had testified. The defendant challenged said Elwood for bias, which challenge was not allowed by the court, and the defendant duly excepted.

Upon said examination Simeon Pease testified substantially as juror Jennings had testified. The defendant's counsel challenged said Pease for bias, which challenge the court disallowed, and the defendant's counsel duly excepted. The defendant's peremptory challenges had been exhausted before said Pease was examined and accepted as aforesaid.

The defendant assigns for reasons of appeal:—

"1. The court erred in refusing to permit the defendant to testify as to what inducements were held out to him by the authorities in Columbus, Ohio, and by the detective, Crouch, which prompted him to make the alleged statement to Mr. Diehl. 2. The court erred in refusing to give the defendant an opportunity to produce the detective, Crouch, to testify as to said inducements. 3. The court erred in holding that the alleged statement made by the defendant to Mr. Diehl was a free and voluntary one, and in admitting said statement in evidence. 4. The court erred in holding that the statement alleged to have been made by the defendant to sheriff Hawley, on the elevated railroad train in New York City, was free and voluntary, and in admitting said alleged statement in evidence. 5. The court erred in over-

ruling the defendant's challenge to juror Rufus B. Jennings. 6. The court erred in overruling the defendant's challenge to juror Frank J. Elwood. 7. The court erred in overruling the defendant's challenge to juror Simeon Pease."

*James T. Lynch* and *Jeremiah D. Toomey, Jr.*, for the appellant (the accused).

The court erred in holding that the alleged statement made by the accused to Mr. Diehl was a free and voluntary one, and in admitting said statement in evidence. 1 Bish. New Cr. Pro. §§ 1218, 1223; *State* v. *Field*, Peck (Tenn.), 140; *People* v. *McMahon*, 15 N. Y. 387; *State* v. *Potter*, 18 Conn. 178; *Bram* v. *United States*, 168 U. S. 532; *Newman* v. *State*, 49 Ala. 12; *Stephen* v. *State*, 11 Ga. 234; *Simon* v. *State*, 5 Fla. 296; *Com.* v. *Curtis*, 97 Mass. 578; *People* v. *Smith*, 15 Cal. 411; *Peter* v. *State*, 4 Smed. & M. 34; *State* v. *Peter*, 14 La. Ann. 521; *State* v. *York*, 37 N. H. 182. The law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence is used. *State* v. *Phelps*, 11 Vt. 116; 1 Bish. New Cr. Pro. § 1233. One not in authority, holding out hope of favor, is to be viewed the same as one in authority, if it further appears that in fact his representation took effect and swayed the mind of the person confessing. 1 Bish. New Cr. Pro. § 1234 and cases cited; *State* v. *Potter, supra;* 6 Amer. & Ency. of Law, 545; *People* v. *Phillips*, 42 N. Y. 200; *People* v. *Thompson*, 84 Cal. 604; *Com.* v. *Nott*, 135 Mass. 272; *People* v. *Chapleau*, 121 N. Y. 272; *Regina* v. *Doherty*, 13 Cox C. C. 23; *Porter* v. *State*, 55 Ala. 105. The court erred in holding that the statement alleged to have been made to Sheriff Hawley, on the elevated

Prior to the argument Mr. Fessenden moved that certain statements in the brief of counsel for the accused, alleged to be quotations from the stenographer's notes, might be eliminated, upon the ground that they formed no part of the official record and had been refused a place therein by the trial judge upon application of defendant's counsel. After a brief consultation the court granted the motion and struck out the objectionable statements. REPORTER.

railway train in New York, was a free and voluntary statement, and in admitting said statement in evidence. *Bob* v. *State*, 32 Ala. 566; *Porter* v. *State, supra.* The court erred in over-ruling the defendant's challenges to jurors Jennings, Elwood and Pease. Each of them testified on *voir dire* that he had an opinion that a murder had been committed. Jennings and Elwood both testified that it would require evidence to remove that opinion from their minds. The defendant's per-emptory challenges had been exhausted before said Pease was examined and accepted. In order to prove the crime laid in the indictment against the accused, the State would have to prove at the outset that a murder had been committed. In accepting, as jurors, men whose minds were already made up on that question, the accused was deprived of a fair and impartial trial, and was obliged to prove to the minds of those jurors that no crime of murder had been committed. *Polk* v. *State*, 45 Ark. 165; *Alfred* v. *State*, 37 Miss. 296; *Eason* v. *State*, 6 Baxter, 466, 476. If a juror has formed or expressed an opinion on the case, or an essential part of the case, such as would require evidence to remove, he is disqualified. *Potter* v. *State, supra;* 1 Burr's Trial, 367; *People* v. *Rathbun*, 21 Wend. 509, 542; *Armstead* v. *Com.*, 11 Leigh, 657; *Walsh's Case*, 2 Wall. Jr. 143; *Trumbull* v. *State*, 2 Iowa, 404, 414.; *Gray* v. *People*, 26 Ill. 344; *Cancemi* v. *People*, 16 N. Y. 501; *Com.* v. *Knapp*, 9 Pick. 496; *Tweedy* v. *Brush*, Kirby, 13; *Smith* v. *Ward*, 2 Root, 302.

*Samuel Fessenden*, State's Attorney, for the appellee (the State).

The confession of the accused made to Mr. Diehl was prop-erly admitted by the trial court. *Rizzolo* v. *Com.*, 126 Pa. St. 74; *Fife* v. *Com.*, 29 id. 429; *People* v. *New York*, 91 N. Y. 241; *State* v. *Workman*, 15 S. Car. 540–544; *Com.* v. *Smith*, 119 Mass. 305–311. The prime object, of course, in scruti-nizing confessions of crime prior to their admission in evidence, is to ascertain their truthfulness. See Wharton, Cr. Ev. (9th ed.), § 658. The limits of the rule are well and authorita-tively defined in *State* v. *Coffee*, 56 Conn. 399–414. **See**

also *State* v. *Potter*, 18 Conn. 166; 1 Greenl. Ev. (14th ed.)
§§ 221, 229; 6 Amer. & Eng. Ency. of Law (2d ed.), 525,
527, 529, and leading cases cited; 1 Roscoe, Crim. Ev. pp. 79,
* 50; 3 Rice, Cr. Ev. p. 490; *Owen* v. *State*, 78 Ala. 425. The
finding of the court brings the case at bar clearly within the
rule. See also the elaborate opinion in *Bram* v. *United States*,
168 U. S. 532. A voluntary confession will be received, though
it may appear that immediately after his apprehension the ac-
cused had been threatened, but without effect, in order to pro-
cure a confession. Underhill on Crim. Ev. §§ 126, 129, 139;
Wharton, Cr. Ev. (9th ed.) § 677; *McAdoy* v. *State*, 62 Ala.
154; *Simon* v. *State*, 36 Miss. 636–639; *State* v. *Carr*, 37 Vt.
191–195; *State* v. *Hash*, 12 La. Ann. 895, 896. The state-
ment to sheriff Hawley was admissible upon the foregoing
authorities. "The sufficiency of the evidence to show the
competency of the confession, is primarily a question for the
court. As to how he shall satisfy himself with respect to this
question, or as to what extent he will hear proof thereon, is
necessarily a matter almost entirely within his discretion, the
exercise of which should not be revised except in case of pal-
pable abuse." *Brady* v. *United States*, 1 App. Cas. (D. C.)
246. See also *State* v. *Workman*, 15 S. Car. 540; *State* v. *Staley*,
14 Minn. 105. The rulings complained of, in relation to the
jurors, were clearly in accord with the best considered opinions
on that subject. *Rizzolo* v. *Com.*, 126 Pa. St. 54; *Garlitz* v.
*State*, 71 Md. 293; *Coughlin* v. *People*, 144 Ill. 140; *Allison* v.
*Com.*, 99 Pa. St. 18. In Connecticut the case of *State* v. *Hoyt*,
47 Conn. 518, 521, 530, seems to be decisive of the question. If
a juror is satisfied that he can render an unprejudiced verdict,
the fact that he has read newspaper accounts of the crime is
immaterial on the question of his capacity to act. See espe-
cially the opinion of *Butler*, *C. J.*, in *State* v. *Wilson*, 38 Conn.
126–139. See also *State* v. *Smith*, 49 Conn. 376–378; *Peo-
ple* v. *Brown*, 48 Cal. 253; *Plummer* v. *People*, 74 Ill. 361;
*Thomas* v. *People*, 67 N. Y. 218; *Greenfield* v. *People*, 20
N. Y. Sup. Ct. 242; *Heart* v. *State*, 57 Ind. 102; *Gillooley*
v. *State*, 58 id. 182; *State* v. *Lartigue*, 29 La. Ann. 642;
·*Curley* v. *Com.*, 84 Pa. St. 151; *State* v. *Tatro*, 50 Vt. 483.

HAMERSLEY, J. The statement made by the accused was admissible as a declaration against his interest. "Declarations of a party against his interest are always admissible in evidence." *Ives* v. *Bartholomew*, 9 Conn. * 309, * 312. They are not admitted as testimony of the declarant in respect to any facts in issue; for that purpose they are open to the objections to hearsay evidence. They are admitted because conduct of a party to the proceeding, in respect to the matter in dispute, whether by acts, speech, or writing, which is clearly inconsistent with the truth of his contention, is a fact relevant to the issue. A party cannot ordinarily prove his own conduct in support of his contention, because he might thus manufacture evidence in his own behalf; but there is a presumption that he will not make evidence against his interest.

The probative force of such declarations must depend on the circumstances of each case. They may have little, if any, weight, or, in connection with other evidence, they may amount to convincing proof. The laws of evidence apply equally to civil and criminal cases, subject to a very few exceptions. JUSTICE STEPHEN said: "I know of only four rules of evidence which can be said to be peculiar to criminal proceedings." 1. The prisoner and his wife are incompetent witnesses. (The same rule of interest, however, excluded in civil cases.) 2. The rules relating to evidence of confession. 3. The rule respecting dying declarations. 4. Evidence as to character of accused. 1 Steph. Cr. L. 439. It will be found that the peculiarities of evidence in criminal law are not due so much to any departure from the settled law of evidence, as to the application of that law to conditions found only in criminal practice. The axioms that define the methods by which truth can be most effectually ascertained, are the same in all cases. So the rules referred to, relating to evidence of confessions, were not intended to deny the self-evident fact of the probative force of declarations against interest, nor to forbid its application in criminal cases, but simply to regulate its application to conditions peculiar to a criminal trial. These conditions are the liability

State v. Willis.

of accused persons after their arrest, upon promise of favor from those having control of the prosecution, to untruly admit guilt or misstate criminatory acts for the purpose of securing immunity through the promised favor; and the liability of inferior police officers to report untruly or inaccurately the chance expressions or conversations of prisoners in their charge. In criminal practice the judge ascertains the circumstances under which the declaration was made, and, if made under certain circumstances, excludes the evidence, not as irrelevant, but as unreliable and immaterial. But if it clearly appears that the declaration, or any part of it, in connection with other evidence, is in fact both reliable and material,—as when the accused tells where the instruments or product of a crime are to be found, and they are shown by other evidence to have been found and identified in pursuance of the information,—the information is admitted, no matter under what circumstances it was made. *Regina* v. *Gould*, 9 C. & P. 364. The rule of practice as to the exclusion of confessions is one that admits of great variety in application. Steph. on Ev. p. 52.

The rules of application referred to by JUSTICE STEPHEN did not come to us from the English common law; they were developed in England after our independence, from the general proposition that "confessions ought to be voluntary and without compulsion." 1 Steph. Cr. L. 447. This proposition expresses a well established principle of evidence; it applies to admissions as well as to contracts, or to any act whose probative force depends on intent or assent. If the voluntary mental condition which should characterize the act does not exist, either through the compulsion of duress or the temporary aberration of intoxication, or from other cause, the evidential significance of the act is destroyed. For this reason any admission compelled by the torture of violence or compulsion of duress is inadmissible; *State* v. *Hobbs*, 2 Tyler, 380; *Tilley* v. *Damon*, 11 Cush. 247; *Com.* v. *Morey*, 1 Gray, 461; just as a contract entered into under the same circumstances is void; while an admission secured by fraud which

does not touch the voluntary character of the act, is admissible. *Rex* v. *Derrington*, 2 C. & P. 418.

It is very necessary to a clear understanding of the course of decisions on this subject, to distinguish between that compulsion which may destroy the significance of an evidential fact, and the use of force to compel a person to testify against himself. The maxim " *Nemo tenetur seipsum accusare*," expresses a personal right, whose recognition in the administration of justice is peculiar to the common law and deemed by us of sufficient importance to receive the protection of constitutional guaranty. But this right is a purely personal one, and involves exemption from a compulsory disclosure of one's crime, when called upon to testify upon one's own trial or in any legal proceeding. The secrets of each man's heart are his own and cannot be forced into expression. Violence applied for that purpose is held to be an infringement of personal liberty. But the testimony of an accused is legitimate (unless excluded on the ground of interest) and is never excluded merely because the witness expects a benefit.

The only instance in the nature of testimony by an accused on his own trial, known to the common law, is confession in open court, *i. e.*, plea of guilty, which is conviction. The confusion of such " confession " with admissions which are not testimony, but are proved as an independent fact which may be relevant to the general issue of guilt, or to some particular fact in issue, is responsible for much uncertainty. The two are absolutely distinct. This common law " confession " is practically the testimony of the accused given in open court, going directly to the facts charged, conclusively proving those facts, and sufficient of itself to support conviction.

An admission of the accused which may be proved as relevant to any fact in issue, is not testimony; it is a fact to be proved by testimony; it may tend to prove the main fact in issue, but is not competent to prove that fact and cannot of itself support a conviction. There are some cases which seem to favor the theory that an uncorroborated admission can justify conviction; but examination shows that in most, if not all of these cases, there was other evidence, and the

theory is repugnant to the firmly established principle that the essential elements of a crime must be proved by witnesses in court testifying of their own knowledge.

It is difficult to conceive of a " confession " that is not induced by a sense of interest; and the common law directly recognizes confessions procured by the official promise of benefit. Confession is simple, *i. e.*, plea of guilty; or relative, *i. e.*, in order to attain some other advantage. Relative confession is where the accused confesseth and appealeth others thereof, thereby to become an approver. 2 Hale P. of C. Chap. XXIX. If upon this appeal the approver is successful, he receives pardon, if he is not successful he is convicted upon his confession, that is, upon his testimony against himself; and this testimony has not been obtained by force because it was given under a conditional promise of immunity. The law of approvers is obsolete; but the principle is illustrated to-day, when the public prosecutor offers to put an accused upon the stand, under an implied promise of pardon if he testifies fully, and then, if the accused acts dishonestly, procures his conviction upon the testimony so obtained. *Com.* v. *Knapp*, 10 Pick. 477, 478; *Moore's Case*, 2 Lew. C. C. 37. Of course, such evidence as against an accomplice is of a suspicious character and needs corroboration, but the point now is that such testimony against 'one's self is not compelled, but is legally voluntary when induced by official promises of favor. Indeed, it is matter of almost daily experience in criminal courts that testimony of the accused against himself by a confession in open court upon which conviction is based, is induced by promises, directly or indirectly obtained from the prosecuting officer, of favor in the matter of punishment. And such action of the prosecuting officer, when prudently taken, the accused having advice of counsel, is approved by the court. But if the constitutional provision that no accused person shall be compelled to give evidence against himself, includes the compulsion of personal benefit, then every one so convicted should be discharged. It would, in truth, be a violation and not a protection of personal liberty, to prevent one from testifying when he believes it to

be for his interest. And yet we find *dicta* of judges that not only favor such an impossible latitude, but apply this provision against enforced self-criminating testimony to the considerations determining the weight belonging to evidence given by others in respect to the conduct of the accused. Such *dicta* would never have been uttered, had the radical distinction between the proof of conduct of a party as a relevant fact, whose weight may be greater or less according to the surrounding circumstances, and the use of force to compel a person to testify against himself, been kept in mind.

The English decisions which have developed the existing practice in excluding admissions, are not concerned with their admissibility as relevant, but mainly if not wholly with their weight. And the word "voluntary" is used, not merely as contrasted with compulsory, but with a technical meaning indicating certain surrounding circumstances. The question is, shall this evidence, admissible as relevant, be excluded, because in the opinion of the judge the conditions of the declaration come within those conditions that make such an admission too unreliable to go to the jury; and the decisions illustrate the diverse exercise of this judicial discretion. The earliest of these cases were decided about 1783, and in these the court was evidently influenced by a desire to use its power in behalf of the prisoner. It was during the flood tide of the bloody code of England, when every conscientious judge was moved to strain his power to escape its ruthless results. This is indicated in *Thompson's Case*, 1 Leach C. C. 291. The declaration was objected to because made under circumstances calculated to induce the accused to say an untruth for the sake of personal safety. The court said: "It is almost impossible to be too careful on this subject. . . . I must acknowledge, that I do not like to admit confessions, unless they appear to have been made voluntarily, and without any inducement. Too great a chastity cannot be preserved on this subject; and I am of opinion, that under the present circumstances the prisoner's confession, if it was one, ought not to be received." After this followed a great number of *nisi prius* rulings; for the most part reported with uncer-

tain brevity. They are contradictory; some of them grotesque in their unreason. Finally they came to be regarded as precedents for testing the character of inducements by technical meanings given to certain forms of words. An effectual stop was put to this tendency in 1852, by the appellate court for crown cases reserved, in *Baldry's Case*, 2 Den. C. C. 430. In this case POLLOCK, C. B., said (p. 441) that the grounds for not receiving confessions are not "that there is a presumption of law one way or the other," but "because it is supposed that it would be dangerous to leave such evidence to the jury." PARKE, B. (p. 445), intimated a doubt whether "it would not have been better to have allowed the whole to go to the jury," and said: "I confess I cannot look at the decisions without some shame when I consider what objections have prevailed to prevent the reception of confessions in evidence;" and, referring to the experience of his associates, "we all know how it occurred. Every judge decided by himself upon the admissibility of the confession, and he did not like to press against the prisoner, and took the merciful view of it." EARLE, J. (p. 446), said: "According to my judgment, in many cases where confessions have been excluded, justice and common sense have been sacrificed, not at the shrine of mercy, but at the shrine of *guilt*." Since *Baldry's Case*, the decisions have been very different from the earlier ones. The old theory of a form of words being decisive as to the effect of an inducement, was distinctly denied in *Queen* v. *Jarvis*, L. R. 1 C. C. R. 96, 99, and *Queen* v. *Reeve*, ibid. 362.

The English decisions which have developed this practice are not binding as authority in American States which have adopted the English common law existing at the time of our separation; but they have been largely followed, and decisions in the State courts exhibit something of the same contradictions and changes. In Massachusetts the more reasonable theory of modern English decisions prevails. *Com.* v. *Knapp,* 9 Pick. *496, 502; *Com.* v. *Morey,* 1 Gray, 461, 462; *Com.* v. *Howe,* 132 Mass. 250, 260. In Pennsylvania the common sense view was early adopted. The hope of benefit which

actuates every confession is not of itself sufficient to exclude. "The true point of consideration, therefore, is whether the prisoner has falsely declared himself guilty of a capital offence." *Com.* v. *Dillon,* 4 Dall. 116, 118; *Fife* v. *Com.,* 29 Pa. St. 429, 436.

In some States the matter has been regulated by statutes. If it is sound policy to exclude from evidence any class of statements made to officers, it would doubtless be far better to regulate by statute the conduct of officers, excluding all statements resulting from any violation of the statute, and to leave admissions to be controlled in every other particular by the general law of evidence. The subject has been somewhat complicated with the effect of testimony given by persons suspected of crime, in examinations by members of the privy council under a common-law power in cases of treason and by justices of the peace under the statutes passed in the reign of Phillip and Mary. Similar statutes have been passed in some of our States. A study of the law in respect to such examinations does not alter the conclusions we have reached.

In this State it has been the practice to exclude statements of the accused made to an officer, when they have been induced by promises of favor made by the officer in respect to the prosecution. This practice was recognized in *State* v. *Potter,* 18 Conn. \*166, \*178. The opinion discusses some of the early English cases, but cannot be regarded as investing them with authority. It maintains the theory that the inquiry "is addressed to the discretion of the court." Indeed it is impossible to reconcile the necessary diversities of the practice of occasional exclusions of admissions, upon any theory (where the surrounding circumstances do not show duress), unless it is regarded as an exercise of the power of the court involving a duty to exclude testimony *prima facie* relevant, when satisfied that it is worthless and unfair to the prisoner. When the English courts first began to exclude admissions, it was evidently an exercise of the power of the court to secure fair play for the prisoner; the same power has been used by some great judges in permitting the accused to make an explanatory statement, although the law forbade

State *v.* Willis.

his appearing as a witness. The discretion of the judge in receiving a confession is, however, reviewable, because a question of duty is involved, and a clear case of abuse would furnish ground for a new trial. That trial courts have acted wisely in this matter is evident from the fact that for more than a hundred years only a single case has come to this court for review. .

In the case at bar the admission was made in the presence of the sheriff, after the accused had been duly warned; no claim is made that it was inadmissible by reason of anything that took place at the time. But counsel for the accused urge in support of their third reason of appeal, that the admission was induced by promises of the detective who brought the prisoner from Columbus, Ohio, to New York, where he was placed in the hands of the sheriff. We assume that the admission would and should have been excluded, had it been made to the detective. It was not so made, but was made to superintendent Diehl in the presence of the sheriff, a few hours afterwards. The accused claims that where inducements are held out by one officer and shortly afterwards an admission is made to another, it must be held as a matter of law that the subsequent admission was caused by the prior inducement. This is clearly not so. "It is not to be presumed that, if one officer makes threats or promises, their influence will lead the prisoner to accuse himself falsely to another officer." *Com.* v. *Cuffee,* 108 Mass. 285, 288; *Moore* v. *Com.,* 2 Leigh, 701. Even when the promises induce a confession, a second confession, found not to be under the influence of the former promises, is admissible. *Rex* v. *Clewes,* 4 C. & P. 221; *State* v. *Howard,* 17 N. H. 171, 183; *State* v. *Carr,* 37 Vt. 191, 195; *Regina* v. *Cheverton,* 2 F. & F. 833; *Com.* v. *Howe,* 132 Mass. 250, 260.

Whether the admission was or was not induced by the prior promises, is a collateral question of fact on the evidence. *Regina* v. *Cheverton, State* v. *Carr, supra; State* v. *Squires,* 48 N. H. 364, 368. "The principle is well settled that where the admissibility of evidence depends upon a preliminary question of fact, to be tried by the court, its decision is not

to be reversed unless in a case of clear and manifest error."
*Fife* v. *Com.*, *supra*, p. 437. Here the trial court has found
upon the evidence that the admission of the accused was not
made by reason of the prior inducements, but was freely and
voluntarily made, knowing that it might be used against him.
The whole of this evidence does not appear in the record, but
enough appears to indicate that the accused placed no reli-
ance on the talk of the detective; but did rely on the state-
ment made or authorized by the sheriff, and in view of that
statement made his admission, as he says, " unconditionally."

The confession was properly admitted, but it remained for
the jury to give it such weight as they might think it merited,
in view of all the circumstances which led up to it. They
could not found a conviction upon it, unless satisfied beyond
a reasonable doubt that, in connection with the direct evi-
dence of the crime, it spoke the truth. The accused has not
excepted to the charge of the court, and it must be assumed
that in regard to this, as well as to all other points, it was
adequate to the nature of the case.

The fourth reason of appeal assigns error in admitting a
declaration made to the sheriff just after the declaration to
Diehl had been made. It consisted in a statement that the
accused had pawned the watch taken from the murdered man,
at a described pawn-shop in Philadelphia, and was offered in
connection with evidence identifying the watch and proving
that it was found in pursuance of the statement of the accused
at the place described. This declaration was admissible, no
matter what promises had been previously made. *Laros* v.
*Com.*, 84 Pa. St. 209; *Com.* v. *Knapp*, 9 Pick. *496, *511;
*Com.* v. *James*, 99 Mass. 438, 441; *Regina* v. *Leatham*, 8 Cox
C. C. 498, 503; *Regina* v. *Gould*, 9 C. & P. 364; *Duffy* v.
*The People*, 26 N. Y. 588, 590; 2 Swift's Dig. 434.

The first and second reasons of appeal are not based upon
the record. The court did not refuse permission to the de-
fendant to testify, and did not refuse to give the defendant
an opportunity to produce the detective, Crouch; on the con-
trary, the court received a statement prepared by the accused
containing his own account of the transaction, and precisely

what he claimed the detective, Crouch, would testify to if present, and this statement was received by the court with the consent of the State's Attorney and of the accused, as the testimony of Crouch and of the accused. With this action, so plainly in his interest, the accused was satisfied, and did not afterwards ask to be called as a witness, and did not ask for an adjournment in order to find the detective, Crouch; we do not mean to intimate that a refusal to adjourn under the circumstances would have been error.

The fifth, sixth and seventh assignments of error furnish no ground for a new trial.

The opinions formed by the jurors challenged were not settled opinions, such as imply a prejudice from being committed to one side of the question; nor were they formed in such a way that hostility or prejudice against the prisoner may be inferred from their existence. The law on this subject was settled in *State* v. *Wilson*, 38 Conn. 126, 138. We said in that case, speaking of opinions like those now claimed as disqualifying: "They had their origin in no relationship, partiality or prejudice, but from reading an ordinary statement of the circumstances attending the killing, for aught that appears impartially obtained, and candidly stated in the newspaper, and those opinions, impressions, or suppositions, received no tincture of prejudice from any other source. For various reasons we are satisfied that such opinions should not in theory, and do not in fact, incapacitate a man from sitting as an impartial juror." See also *State* v. *Potter*, 18 Conn. * 166, * 172; *State* v. *Smith*, 49 id. 376, 378. Of course, an opinion of this kind may be said to be one that will require evidence to remove; as long as the hypothesis which led to the opinion is unchallenged, the opinion will remain. But it is not one which requires evidence to remove, in a sense that implies any partiality; and is very different from an opinion so fixed as to require evidence to remove a prejudice against a prisoner, before the juror can hear and weigh the testimony fairly. It is possible that reading a newspaper account of a crime may produce a settled opinion which in fact renders **one partial, prejudiced and unfit to be a juror;** but common

experience tells us that such a result is not the usual one. In this case the court below has found that the jurors challenged were not prejudiced by reading the newspaper; we think the finding is fully justified by their examination.

There is no error in the judgment of the Superior Court.

In this opinion the other judges concurred.