THE STATE OF CONNECTICUT *vs.* FRANK A. DIBATTISTA.

First Judicial District, Hartford, January Term, 1930.

WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

Argued January 9th—decided January 24th, 1930.

*Augustine Lonergan* and *John F. Forward,* Public Defender, for the appellant (the accused).

*Hugh M. Alcorn,* State's Attorney, with whom was *Donald Gaffney,* and, on the brief, *Harold E. Mitchell,* for the appellee (the State).

WHEELER, C. J. The accused elected to be tried under Public Acts of 1927, Chapter 107, by the court composed of three judges. We held in *State* v. *Frost,* 105 Conn. 326, 329, 135 Atl. 446: "The court is by this statute substituted for the jury and fulfils in the trial of a criminal cause without a jury the duties of both court and jury." Fulfilling the function of the jury it determines upon the evidence the guilt or innocence of the accused. In a case tried to the jury the only method open to the accused of having that question determined on appeal is by motion to set aside the verdict and assigning the denial of that motion as one of the grounds of the appeal. To make the practice uniform would require the adoption of a like

practice in behalf of an accused in the case tried to the court. "This would require the trial court to again pass upon the ground necessarily involved in its judgment and delay the appeal pending the argument and disposition of the motion. In the interest of a simpler and speedier procedure we think the making of this motion should be dispensed with and that the accused should only be required to assign this reason of appeal among his assignments of error when the appeal is taken." *State* v. *Frost, supra,* at page 331. At the suggestion of the trial court, counsel for the accused filed a motion to set aside the verdict, which the court denied and this is assigned in the appeal as one of the grounds of error. The filing of the motion was contrary to the practice as outlined in *State* v. *Frost.* The proper practice was to have assigned as one of the grounds of error that the court erred in adjudging upon the evidence the accused guilty of the crime charged beyond a reasonable doubt. In addition to the error in denying their motion to set aside the verdict, counsel for the accused also assign this error in accordance with the procedure outlined in *State* v. *Frost,* although in somewhat unnecessary detail, and we shall now consider this assignment of error. The evidence justifies the finding of these facts: The accused had owned an Iver-Johnson thirty-eight caliber revolver and a box of loaded cartridges for upward of six months. It was a hammerless, double action revolver which is cocked and discharged by one pressure on the trigger. The accused by experiment with the unloaded revolver learned about the operation of the safety catch on the revolver which was released by the same pressure on the trigger which discharged the revolver and he knew that it was unlawful to have a revolver in his possession. Early in March, 1929, the accused took up his residence in the home of Crapuli,

they occupying the same bedroom where the accused kept his loaded revolver and bullets. During this time the accused asked Crapuli several times to accompany him in the unlawful enterprise of holding up some store in Hartford. On the evening of April 1st, 1929, Crapuli and the accused walked from Crapuli's house to the center of the city where about seven-thirty they separated. Upon leaving the house the accused wore a brown cap and a brown overcoat and carried his loaded revolver on his person between the front of his trousers and the front of his shirt. A little after ten o'clock the accused walked along Seymour, Park and Cedar Streets to find a store in which there would be no people so that he could go in and steal money but finding there were people in these stores he passed on and came to 116 Jefferson Street, a store owned and operated by Samuel Kamaroff, the deceased. The accused had the specific intention of stealing from some store and to aid in this purpose he carried his loaded revolver underneath the top part of his trousers. As he approached the Jefferson Street store, he took the revolver from this position and placed it in his right overcoat pocket, because it was easier to draw it from that position.

"The store . . . faces the south and is a small store about seventeen feet three and one-half inches north and south and about fifteen feet east and west. There are two store windows in front and an entrance door from the street is recessed between them about three feet. The distance between the street door and the rear wall of the store is about fourteen feet three and one-half inches. There was an open space in the front of said store and another smaller open space in the rear on the west side. This smaller space was about five feet four inches east and west and about three feet four inches north and south in its narrowest place.

In the west part of this open space three steps lead up to a doorway into a living room in the rear of said store. A cash register was on a showcase just east of this open space and about three feet ten inches from said steps. This open space was reached from the larger open space in the front of the store by a passway about seventeen inches wide between a showcase on the west and a low refrigerator about two feet seven inches high on the east."

In the rear of the store was the apartment in which Kamaroff, his wife, who assisted in the operation of the store, and his two children lived. It consisted of a sitting room adjoining the store and beyond this a kitchen and bedroom. The distance from the nearest corner of the showcase on which the cash register stood to the steps was three feet and ten inches. Various articles of merchandise were piled upon the showcase on which the cash register was set and upon the cash register itself and merchandise filled the shelves on three sides of the store. The store was crowded and cramped for free space.

Shortly after ten o'clock on the night of April 1st, 1929, Kamaroff went from his apartment through the store and outside to the tailor shop next door to ascertain the time. He returned directly to the apartment and remarked to his wife it was twenty minutes after ten. At about this time the accused entered the store which was lighted carrying the loaded revolver in his right hand and went directly to the cash register with the intention of stealing therefrom and of using his revolver, if necessary, to accomplish this purpose. At about the time the accused was approaching the cash register Kamaroff started to leave the kitchen in order to close the front door of the store, when there was a heavy and unnatural ring from the cash register. Mrs. Kamaroff rose and started for the store when she heard

a shot and ran out and found her husband sitting on
the first of the three steps to the apartment, shot, and
a man running away whom she pursued to the street
and whom she saw wore a brown coat and had a pe-
culiar run. The man turned, threatening her with a
revolver, and she ran back and on the trial identified
the accused as this man. As Kamaroff entered the
store the accused standing near the cash register com-
manded him "to stick them up." Kamaroff exclaimed,
"What!" Thereupon the accused fired at him, and
the bullet struck Kamaroff on the left side of the head
at a point one and one half inches posterior to the
attachment of the upper attachment to the left ear
and four and one quarter inches posterior from the
outer angle of the left eye. The bullet, a thirty-eight
caliber, was found in the head of Kamaroff. It had
fractured the skull on the right side of the head at a
point one half inch forward from its point of entrance
on the left side and about one inch or half an inch
above the level of the wound on the left side. It had
proceeded through the left hemisphere of the brain and
the right hemisphere of the brain in a straight line.
At a point three quarters of an inch below the lower
edge of the wound, extending down over an area of
five inches, there were imbedded in the skin, sixty-
eight grains of powder. There was no burning of the
skin near the entrance wound. The thirty-eight cali-
ber bullet found in the head of Kamaroff was fired
from the revolver owned by the accused and fired by
him at Kamaroff. The accused, as he fled from the
store, dropped on the floor four thirty-eight caliber
loaded cartridges of the same kind as the bullet found
in the head of Kamaroff. A few minutes after Kama-
roff was removed to the Hartford Hospital he died
of this gunshot wound.

The accused, running from this store, circled the

vicinity of the crime and returning to the neighborhood of Park and Main Streets, got into an automobile occupied by an acquaintance of his and sat there with him and saw the ambulance responding to the aid of his victim. At this time the accused carried his revolver on his person between the front of his shirt and the front of his trousers. The accused next sought his friend Crapuli and later found him in an apartment and handed him the revolver which was warm and unloaded. He shortly took the revolver from Crapuli and cleaned it. At this time, in the presence of Crapuli and another, the accused stated that he had shot a guy in the back and did not know whether he had killed him or not.

On the next evening Crapuli took the revolver from this apartment, wrapped it in a towel, drove over the Hartford-East Hartford bridge, stopped near the east side, got out and threw it in the Connecticut River near its east bank. The loaded cartridges were left in the room where Crapuli and the accused slept and taken by Crapuli and hidden under a board walk in back of his garage and on the next Sunday Crapuli wrapped up the box of cartridges and threw them in the pond in Colt's Park.

The accused after shooting Kamaroff got in the automobile of his acquaintance and later went to the apartment, as he admitted on the witness stand, for the purpose of establishing an alibi. The accused was arrested on April 8th, 1929, on the charge of murder. Upon being questioned concerning the bullets he said he had delivered them to Crapuli and advised him to tell all about them. Shortly thereafter Crapuli told all he knew about the crime and on the same evening the accused told Captain of Police Williams all that he knew of this crime. Later in the evening Prosecuting Attorney Griffin wrote out in longhand the con-

fession of the accused in his own words and the accused signed his name at the bottom of each page. When Crapuli threw the revolver in the Connecticut River the waters were quite high, but on June 7th the waters had subsided and the police recovered this revolver which was identified by Crapuli and the accused as the revolver belonging to the accused and laid in evidence.

The foregoing statement of the facts in evidence which the judges might reasonably have found corresponds practically with the finding of facts which the judges made for purposes of appeal with the exception of one important fact. The judges found that the accused had the specific intention of stealing from some store and to aid in this purpose the accused carried his revolver. We think the evidence requires not only the finding of this specific intent but also of the inference that the accused entered Kamaroff's store and went directly to the cash register with the intention of stealing therefrom and using his revolver if necessary to accomplish this purpose.

Counsel for the accused urge that the accused's statement on the witness stand of what occurred at the time of the shooting of Kamaroff should be accepted since it has been his unvarying statement of this occurrence, viz: "When I told him to 'stick 'em up' he started over, by his left hand grabbed my right wrist, and his right hand grabbed my forearm and I tried to pull away and run out. He was holding me, and holding tight. I tried to pull away. In the meantime the gun went off. I don't know what made it go off; never pointed it, fired it, or nothing; and the gun went off; I see the man fall down; I ran out for the door." This statement is an elaboration of what the accused stated in his confession and to Captain Williams. The trial court did not credit a part of his version of this

sad affair. It would be impossible for us to hold, as matter of law, that the trial court should have found in accordance with this statement of the accused. There was no evidence of any struggle having taken place near the cash register or at any place in the store. The location of the wound behind the left ear, the course of the bullet indicating that the revolver must have been held in a horizontal position when fired, make it wholly improbable that the revolver was fired in the manner the accused claims. These two facts, by themselves, are sufficient to justify the trial court in refusing to accept the accused's version of a struggle precipitating the firing of the revolver which without his volition caused the revolver to go off.

The accused also claims that he carried the revolver into the store without intending to use it other than for the purpose of scaring anyone who might interfere with his stealing from the cash register. Whether the accused carried the revolver in his right hand after he entered the store for the purpose of shooting or of scaring anyone who interfered with his stealing from the cash register made no difference as to the crime committed or its degree.

Robbery is defined in Swift's Digest (Dutton Ed.) p. 326, "to be the felonious taking of money or goods to any value from the person of another, or in his presence, against his will, by violence, or putting him in fear." Swift continues (p. 328): "Robbery may be constituted by putting a person in fear, as well as by force, for fear will supply the place of force; yet it is not necessary that actual fear should either be laid in the indictment or strictly proved, provided the property be taken with such circumstances of violence and terror, or threatenings, by word or gesture, as would in common experience induce a man to part with it from apprehensions of personal danger."

Thus it makes no difference in our law whether the taking be by violence, or by putting in fear. Had the stealing been effectuated in this case, as was intended by the accused, there would have been a taking from the personal presence of Kamaroff, that is, from under his personal protection. 2 Bishop on Criminal Law (9th Ed.) § 1177, p. 869. The crime of robbery was not completed in this instance, but the crime of an attempt to commit a robbery was completed. Since there was present the intention to steal from the personal presence of Kamaroff by the use of a deadly weapon, whether its use was to put him in fear or to injure him, the act of endeavor was adapted, as it was intended, to effectuate the purpose, though unsuccessful, and the crime of an attempt to commit a robbery was consummated.

From the unlawful killing of a human being without legal justification or excuse, where there are present no circumstances attending the killing which mitigate or extenuate it, the law implies malice and that the unlawful homicide is committed with malice aforethought and under our statute the crime committed is murder in the second degree. At the least the crime committed by the accused, as his counsel concede, was murder in the second degree. But our statute (General Statutes, § 6187) provides: "All murder . . . committed in perpetrating, or in attempting to perpetrate, any . . . robbery . . . shall be murder in the first degree." If the trial court had found that the killing of Kamaroff by the accused was unlawful and a murder committed in attempting to perpetrate a robbery, the crime committed was murder in the first degree and the court should have so adjudged, provided the indictment had charged the commission of a murder in attempting to commit a robbery. *State* v. *Feltovic*, 110 Conn. 303, 147 Atl. 801. The holding up of any

person, upon the highway, in his home, or place of business, or in any other place, with the intention of stealing from him by the use of a deadly weapon either for the purpose of personal injury to him or to put him in fear, and whether the crime of robbery or attempted robbery be committed, under our law, is murder in the first degree. The increasing number of such instances of "hold ups," in the commission of which an unlawful homicide results not infrequently, are committed by those in ignorance of the fact that if apprehended they must forfeit their life. The protection of society against such crimes demands that this class of criminals, when proven guilty, should receive, in penalty, the rigor of the law. The indictment, however, charged that the accused "feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought did kill and murder" Samuel Kamaroff and it was essential that the trial court find the accused guilty as charged. The court has so found and adjudged; we must determine whether the court erred in this conclusion.

The homicide was committed in the perpetration of the crime of an attempt to commit robbery by the use of a deadly weapon, it was unlawful and there were no circumstances in justification or excuse or in extenuation, hence the crime was committed with malice aforethought. *State* v. *Feltovic, supra.* To constitute murder in the first degree under this indictment the homicide must have been wilful—that is, done intentionally and purposely, not accidentally. The entering of the store by the accused carrying the loaded revolver in his right hand, his intention to steal from the cash register, the circumstances attending the killing, the absence of indication of a struggle, the position the accused and Kamaroff must have been in when the revolver was fired and the fact that the bullet

struck Kamaroff immediately succeeding his failure to obey the command of the accused and his answer to the command, "What!" tend strongly to show that the homicide was not accidental, but intentional. That it was deliberate, not hastily or inconsiderately, but coolly done, is also shown by the circumstances of preparation in furtherance of the intended crime. That it was premeditated, that is, done in pursuance of a previous intent, is shown by the purpose formed upon leaving his residence at seven-thirty o'clock in the evening with the loaded revolver, and entertained, if not during the entire period, at least for all the time the accused was engaged in his search to find a store feasible for his unlawful purpose up to the very time of the killing of Kamaroff. The length of time necessary to deliberate, or to form a specific intent to kill, need only to be time enough to form a wilful, premeditated and specific intent to kill before the killing; and if there be such time, it is sufficient, no matter how long or how short it may be. The trial court could reasonably have found under the evidence, as it did, that it had been proven beyond a reasonable doubt that "the accused shot Kamaroff with malice aforethought, wilfully, deliberately, with premeditation and with a specific intent to kill and murder," and that the proof complied with the statutory requirement that it must be by "the testimony of at least two witnesses, or that which is equivalent thereto." We do not see that any other conclusion was open to the trial court under the facts in evidence than to have found the accused guilty as charged.

Fulfilling the function of the court the three judges determine, as in all cases, all interlocutory rulings made prior to or during the trial, and in their final decision apply the law to the facts found proven. *State* v. *Frost*, 105 Conn. 325, 330, 135 Atl. 446. The

appeal may bring up any matter that might have been brought up had the case been tried to the court while fulfilling solely the duties of the court, and not those of both court and jury. Under the procedure outlined in *State* v. *Frost* the accused is given the advantage of requiring the court to make up a finding of the facts upon which its conclusions are based, while in the case tried to the jury the finding states only the facts claimed to have been proved by each party and the instructions to the jury are tested by reference to these claimed facts. Under this procedure counsel filed their motion to correct the finding and in the appeal assign as error the refusal of the court to comply with their motion in five particulars. The proper procedure has not been specifically pursued. We will overlook the technical inaccuracy and consider these grounds of error. Only three of the grounds require review. As to the substitution in paragraph fifteen for the words "this purpose," "scaring any person who interfered with him" (the accused), we have held, in discussing the motion to set aside the verdict, that if this were found the legal position of the accused would not be bettered. Further, we have held that the trial court was justified in the evidence in finding this intent or purpose on the part of the accused.

We have likewise considered and held adversely to the claim of the accused that he "shot Kamaroff accidentally, involuntarily and without intent, in a struggle." The court was justified in refusing to make this substitution for paragraph fifty-three of the finding. The court found that "the written confession of the accused was made voluntarily and without fear or promise of favor"; the accused asks to have substituted in its place that "the written confession of the accused was not voluntary and was obtained by duress, by promises and by violence." The decision of the issue

as to whether a confession was freely and fairly obtained is one of fact for the legal discretion of the trial court. If this discretion be abused this court will upon proper appeal review the ruling, and if the error be clear, manifest and harmful, grant a new trial. The admission of a confession compelled by violence, or fear, or duress, would be an unreasonable exercise of a court's discretion. *State* v. *Willis,* 71 Conn. 293, 41 Atl. 820; *State* v. *Wakefield,* 88 Conn. 164, 168, 90 Atl. 230; *State* v. *Castelli,* 92 Conn. 58, 65, 101 Atl. 476. "In this State it has been the practice to exclude statements of the accused made to an officer, when they have been induced by promises of favor made by the officer in respect to the prosecution." *State* v. *Willis, supra,* at page 312. The trial court will weigh the claimed confession with the knowledge that sometimes an accused will "untruly admit guilt or misstate criminatory acts for the purpose of securing immunity through the promised favor" and sometimes make a true confession for a like purpose. *State* v. *Willis, supra,* at page 307. It will also weigh the confession of an accused in the light of the occasional liability of a police officer through his zeal, to report inaccurately the statements of an accused, or to exaggerate them. While quick to rectify a real abuse of this rule, in no instance will the trial court permit any legitimate effort of the officers of the law to be hampered in securing from an accused all that he knows concerning the crime charged against him, provided, always, that the means used be not unfair and not subversive of our established rule. We cannot but be conscious of the growing difficulty of detecting crime, and of the discovery of the criminal, due to a more congested society, greater opportunities of escape and the more highly developed criminal knowledge in the hardened crimi-

nal. Peace officers must be judged in their acts by the existing conditions at the time of the acts.

The insistence of counsel has led us to make a careful study of the evidence preceding the making of this confession. That evidence leads us to the conclusion, as it did the court of judges, that the confession was not obtained by violence toward the accused or by putting him in fear, neither was it obtained by inducement held out to him by the police officers. We find not only no trace of undue unfairness toward the accused, but no trace of any form of unfairness. This conclusion conflicts with the testimony of the accused. It was for the trial court to resolve this conflict. We are of the opinion the court exercised its discretion wisely in admitting the confession. The same ultimate conclusion must in our judgment have been reached had the confession been excluded.

There is no error.

In this opinion the other judges concurred.