## STATE OF CONNECTICUT *v.* RODNEY KYLES
(14131)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued December 11, 1991—decision released April 21, 1992

*Louis S. Avitabile,* special public defender, with whom were *Denise Dishongh* and *Joshua R. Kricker,* special public defenders, for the appellant (defendant).

*James M. Ralls,* assistant state's attorney, with whom, on the brief, were *John Connelly,* state's attorney, and *Marcia Smith* and *Bradford Ward,* assistant state's attorneys, for the appellee (state).

BORDEN, J. The defendant, Rodney Kyles, was charged in a substitute information with, in count one, felony murder in violation of General Statutes § 53a-54c[1] and, in count two, robbery in the first degree

[1] General Statutes § 53a-54c provides: "FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree

in violation of General Statutes § 53a-134 (a) (2).[2] After a jury trial, the defendant was convicted on both counts. The defendant appealed to this court from the judgment of conviction by the trial court, *McWeeney, J.,* pursuant to General Statutes § 51-199 (b) (3).[3]

The defendant claims that the trial court improperly: (1) denied his motions for judgment of acquittal because, on the first count of the substitute information, the state presented insufficient evidence of the robbery underlying the felony murder as charged by the state and, on the second count, the state failed to prove that the defendant committed the robbery in the particular manner described in the substitute information; (2) denied his motion for a supplemental bill of particulars that requested the state to name, in count

and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] General Statutes § 53a-134 provides in pertinent part: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[3] General Statutes § 51-199 provides in pertinent part: "(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years. . . ."

one of the substitute information, the victim or victims of the robbery underlying the felony murder; (3) denied his motion to suppress evidence seized from the stop and search of a vehicle; and (4) failed to charge the jury on general intent. We affirm.

The jury could reasonably have found the following facts. On the evening of October 8, 1988, Nathaniel Nelson, John Hofler, Moses Avila, and the defendant drove to Tajildeen Market in Waterbury. The defendant was carrying a .38 caliber handgun and Nelson had a sawed-off shotgun. Shortly thereafter, Jamel Gregg arrived at that location, carrying a .32 caliber handgun, and the five men drove around looking for a place to rob. They decided to "case out" a private gambling club at 267 Walnut Street in Waterbury and Hofler, Nelson and the defendant went inside the club to do so. While inside, they observed several elderly gentlemen playing cards with money on the table. After the three men returned to the car, the group decided that it was a good place to rob because many of the patrons were elderly and would not resist.

At approximately 11:15 p.m., Nelson, Hofler, Gregg and the defendant, with guns drawn, forced their way into the club yelling for the patrons to get on the floor. Avila stayed in the car with the motor running. Hofler, who was unarmed, collected the money from the card table. Two patrons, Charles Demon and Robert Jones, both had money on the table that was taken during the robbery. After another patron, Thomson Lyn, refused to lie on the floor and surrender his wallet, Nelson beat him on the head with the butt of the shotgun and Lyn fell to the floor. Soon after the assault on Lyn, another patron, Robert "Butch" Clark, came into the room from the bathroom and tried to leave the club. The defendant grabbed Clark by the back of the collar, pulled him back into the room and ordered him to lie on the floor. Clark grabbed the defendant's wrists and

a struggle for the handgun ensued. During the struggle, the defendant fired two shots into Clark and both men ended up on the floor with Clark on top of the defendant. The defendant pushed Clark off of him and fired a third shot into Clark's chest. After the shooting, the four men ran out of the club, got into the car and drove off. Clark was rushed to the hospital, where he died from his gunshot wounds.

On November 3, 1989, the state, in its first substitute information, charged the defendant in count one with felony murder alleging that he *"did commit robbery* and in the course of and in furtherance of said robbery [the defendant] caused the death of Robert 'Butch' Clark . . . by shooting the said Robert 'Butch' Clark with a gun." (Emphasis added.) In count two, the state charged the defendant with first degree robbery alleging that he "committed robbery and in the course of the commission of the *robbery upon persons other than Robert 'Butch' Clark,* he was armed with a deadly weapon, to wit: a gun." (Emphasis added.) On that same day, the state filed a bill of particulars that set forth the same facts. Neither the information nor the bill of particulars named the victim or victims of the robbery underlying the felony murder charged in the first count, or the victim or victims of the robbery in the first degree charged in the second count.

On April 25, 1990, the defendant filed a motion for a supplemental bill of particulars requesting the state to name, as to count one of the first substitute information, the victim or victims of the robbery underlying the charge of felony murder and, as to count two of that information, the victim or victims of the robbery in the first degree. Later that same day, however, before the state received the defendant's motion, the state filed a second substitute information that did not change count one but amended count two to allege that the defendant "committed robbery and in the course

of the commission of the *robbery upon Thomson Lyn and other persons not including Robert 'Butch' Clark,* he was armed with a deadly weapon, to wit: a gun." (Emphasis added.) The state also filed a bill of particulars that set forth the same facts. Thus, the state's second substitute information named a specific robbery victim in count two, Thomson Lyn, but still did not name any robbery victim in count one.

At an April 25, 1990 hearing on the defendant's motion for a supplemental bill of particulars, the defendant stated that even though his motion applied to the first substitute information, he was "still claiming the motion for supplemental bill of particulars [for the second substitute information as to count one] because I'm still not satisfied [with the second substitute information] as there is still no allegation in count one as to who was robbed. I think I'm entitled to know who the victim of the robbery in count one is." The court, *Heiman, J.,* denied the motion.

I

The defendant first claims that the trial court improperly denied his motions for judgment of acquittal on the first and second counts of the second substitute information because, on the first count, there was insufficient evidence to prove, as charged in the information, that Clark was robbed and because, on the second count, the state failed to prove that the defendant committed the robbery in the particular manner described. The state claims that the defendant's contention, as to count one, "basically depend[s] upon his own interpretation of the charging documents as to whom he was alleged to have robbed." The state argues that it was not required to prove that Clark was robbed, but was only required to prove that someone in the gambling club was robbed, which the state did prove. The state similarly contends that, as to count two, the

state was not required to prove that Thomson Lyn was robbed, only that someone was robbed, which it did prove. We agree with the state.

## A

As to count one, the defendant's claim, at bottom, is that the state limited the victim of the underlying robbery of the felony murder to Clark. The defendant argues that since there was no evidence presented by the state that Clark was robbed, the felony murder count must fall because the predicate felony was not proven by the state as charged. In support of his interpretation of count one, the defendant relies on the interpretation by the trial court, *Heiman, J.,* of count one during an earlier pretrial hearing on a motion to dismiss. During the course of that hearing, Judge Heiman stated that the inference he drew from the language of the second count in the first substitute information, namely, that the robbery in the first degree was "upon a person other than Robert Clark," was that the victim of the robbery in the first count must have been Clark. The defendant claims that when ruling on his motion for judgment of acquittal, the court, *McWeeny, J.,* "[h]aving decided to let Judge Heiman's interpretation [of the information] . . . stand . . . had a duty to abide by Judge Heiman's interpretation and grant the defendant's motion for judgment of acquittal on the ground that no evidence was presented to show that there was a felonious [robbery committed upon] Clark." This claim is without merit.

The plain language of count one did not limit the victim of the predicate robbery to Clark. Indeed, Clark's name was not even mentioned in that count. The defendant's interpretation of count one essentially treats Judge Heiman's remarks as having orally amended the state's information when, in fact, such an action is ordinarily within the province of the state.

See Practice Book §§ 623 and 624. The first count charged only that the defendant "did commit robbery." It made no mention of the names of the victims or how many persons may have been robbed. Contrary to the defendant's position, Judge McWeeny did not acquiesce in Judge Heiman's interpretation and, in his instructions to the jury, Judge McWeeny stated that the state need not prove that Clark was the robbery victim in count one. Therefore, under this information, since the state proved in count one that someone was robbed, namely Charles Demon and Robert Jones, there was sufficient evidence of the predicate robbery to convict the defendant of felony murder.[4]

## B

As to count two, the defendant claims that his motion for judgment of acquittal should have been granted because the state failed to prove that the defendant had committed robbery in the first degree in the particular manner described in the information. There is no question that the "state is limited to proving that the defendant has committed the offense in substantially the manner described." (Internal quotation marks omitted.) *State* v. *Belton,* 190 Conn. 496, 501, 461 A.2d 973 (1983), quoting *State* v. *Ruiz,* 171 Conn. 264, 270, 368 A.2d 222 (1976); see *State* v. *Ziemba,* 19 Conn. App. 554, 560, 563 A.2d 716 (1989). The defendant argues that while the state could have limited count two by charging the defendant with a robbery upon only one specific person, the "state gratuitously added elements of proving a total of at least three separate robberies," namely, two unspecified persons and Lyn. Since there

---

[4] In the alternative, the defendant claims that count one must be interpreted to allege that the robbery victims in that count were "Thomson Lyn and other persons" as alleged in count two and, therefore, his motion for judgment of acquittal must be granted because there was no evidence presented that Lyn was robbed. This claim fails for the same reasons stated above.

was no evidence presented that Lyn was robbed, the defendant argues that the state failed to prove that the defendant committed the robbery in the particular manner described. The defendant's claim is incorrect.

The state only charged the defendant with one count of robbery in the first degree. Therefore, the state was only required to prove that one person was robbed; see, e.g., *State* v. *Lytell,* 206 Conn. 657, 665–67, 539 A.2d 133 (1988) (state may charge separate robbery count for each and every robbery of each and every person); which the state did prove in this case. Furthermore, after the court had charged the jury, the state, at the defendant's request, essentially amended the substitute information by moving the court to give a supplementary instruction to the jury to disregard the allegation in count two that Lyn was a victim of the robbery. The court gave that supplementary instruction. Thus, the defendant cannot now claim that the state was required to prove that Lyn was robbed when he successfully sought to have the court instruct the jury otherwise.

## II

The defendant next claims that the trial court improperly denied his motion for a supplemental bill of particulars[5] because he was entitled to know the names of the victim or victims of the underlying felony in the felony murder charge. He argues, therefore, that he was denied his right to notice of the charges against him, and that such denial prejudiced his defense. The state claims that the defendant was given adequate notice of the charges against him and, therefore, the defendant was not prejudiced in his defense.[6] We agree

---

[5] The defendant formally claims that the trial court improperly denied his motion in arrest of judgment as to count one. This claim, however, stems from the trial court's denial of his motion for a supplemental bill of particulars and, therefore, we treat this claim accordingly.

[6] The state preliminarily claims that the defendant's second claim should not be reviewed because he failed to comply with the provision of Practice

with the defendant that the trial court improperly denied his motion for a supplemental bill of particulars but conclude that, under the facts of this case, the defendant was not prejudiced by such a denial.

"The sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution guarantee a criminal defendant the right to be informed of the nature and cause of the charges against him with sufficient precision to enable him to meet them at trial. *State* v. *Cates,* 202 Conn. 615, 625–26, 522 A.2d 788 (1987); *State* v. *Franko,* 199 Conn. 481, 490, 508 A.2d 22 (1986); *State* v. *Stepney,* 191 Conn. 233, 240, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984)." *State* v. *Laracuente,* 205 Conn. 515, 518, 534 A.2d 882 (1987), cert. denied, 485 U.S. 1036, 108 S. Ct. 1598, 99 L. Ed. 2d 913 (1988). "When the state's pleadings have informed the defendant of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and were definite enough to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense, they have performed their constitutional duty." (Internal quotation marks omitted.) *State* v. *Spigarolo,* 210 Conn. 359, 381, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989); see *State* v. *Mor-*

Book § 812 that requires a pretrial motion for a bill of particulars to be written and to state the factual or legal basis for the motion. The state argues that the defendant's written motion that was filed on April 25, 1990, applied only to the first substitute information, and that the defendant, at the April 25 hearing, subsequently made an oral motion for supplemental bill of particulars that applied to the second substitute information. Therefore, according to the state, because the defendant's oral motion that was aimed at the second substitute information did not comply with the Practice Book, it was not preserved for appeal. We reject the state's claim of nonreviewability, however, because the record is clear that, despite the procedural informality, the trial court treated the oral motion as properly before the court and addressed the motion on its merits without objection by the state.

*rill,* 197 Conn. 507, 551, 498 A.2d 76 (1985); *State* v. *Vincent,* 194 Conn. 198, 205, 479 A.2d 237 (1984); *State* v. *Killenger,* 193 Conn. 48, 55, 475 A.2d 276 (1984); *State* v. *Roque,* 190 Conn. 143, 154, 460 A.2d 26 (1983).

"[T]he denial of a motion for a bill of particulars is within the sound discretion of the trial court and will be overturned only upon a clear showing of prejudice to the defendant." (Internal quotation marks omitted.) *State* v. *Spigarolo,* supra, 385; *State* v. *Laracuente,* supra, 519. "A defendant can gain nothing from [the claim that the pleadings are insufficient] without showing that he was in fact prejudiced in his defense on the merits and that substantial injustice was done to him because of the language of the information. *State* v. *Rafanello,* 151 Conn. 453, 457, 199 A.2d 13 (1964) . . . ." (Internal quotation marks omitted.) *State* v. *Spigarolo,* supra, 382.

When the state knows the name of a victim or victims, absent exceptional circumstances or important reasons of privacy that do not prejudice the defendant's right to present a defense, it is an abuse of discretion to deprive the defendant, upon proper request, of that information. Cf. *State* v. *Blasius,* 211 Conn. 455, 460, 559 A.2d 1116 (1989) (state has duty to inform the defendant of date offense charged was alleged to have been committed if state has such information); *State* v. *Evans,* 205 Conn. 528, 534 A.2d 1159 (1987), cert. denied, 485 U.S. 988, 108 S. Ct. 1292, 99 L. Ed. 2d 502 (1988); *State* v. *Stepney,* supra, 242. Since this record discloses that the state knew the names of some of the robbery victims, it was an abuse of discretion for the court to deny the defendant's request for these names, to the extent that the state had such information.[7]

---

[7] This does not mean, however, that the state must supply information that it does not have. *State* v. *Evans,* 205 Conn. 528, 536, 534 A.2d 1159 (1987), cert. denied, 485 U.S. 988, 108 S. Ct. 1292, 99 L. Ed. 2d 502 (1988).

Although the trial court abused its discretion by denying the defendant's motion, we conclude that, in this particular case, the defendant was not prejudiced by the denial of the motion. "To establish prejudice, the defendant must show that the information was necessary to his defense, and not merely that the preparation of his defense was made more burdensome or difficult by the failure to provide the information. A. Spinella, Connecticut Criminal Procedure, p. 438; *State* v. *Stepney*, [supra]." (Internal quotation marks omitted.) *State* v. *Spigarolo*, supra, 385. "[T]his court has on numerous occasions adverted to sources extrinsic to the specific count or information to determine whether the defendant was sufficiently apprised of the offense charged. See, e.g., *State* v. *Frazier*, [194 Conn. 233, 237, 478 A.2d 1013 (1984)] (defendant sufficiently apprised where he had access to state's file, police reports and demonstrative evidence); *State* v. *Beaulieu*, 164 Conn. 620, 626, 325 A.2d 263 (1973) (information supplied by another count, state's attorney and court); see also *State* v. *Moffett*, 38 Conn. Sup. 301, 310, 444 A.2d 239 (1981) (defendant's access to prosecution file)." *State* v. *Spigarolo*, supra, 384.

In October, 1989, the defendant filed a motion for discovery requesting material relevant to this case from the state. In response to this discovery request the state, in November, 1989, well before the trial began in June, 1990, delivered a complete copy of the state's attorney's file to the defendant. That file, as the defend-

Nor does it preclude the state from responding to such a request in a way that reflects the state's uncertainty regarding which, if any, of the potential victims it will ultimately be able to prove as an actual victim of the robbery, as it did in the second count of the information in this case. It simply means that, if the state knows the names of any of the potential victims of the crime charged, but is uncertain, because of the vagaries of proof or the state of the evidence, whether all of those names will ultimately be proven as victims, it must make a good faith effort to disclose the names that it does have.

ant conceded in oral argument in this court, contained statements from several patrons who were at the gambling club on the night of the robbery. In particular, the file contained the statement of Robert Jones, who told the police that his wallet had been stolen during the robbery. Thus, the defendant was aware well before trial of the name of a specific person alleged to have been robbed during the robbery. As stated earlier, the state was only required to prove that one person was robbed. See *State* v. *Lytell,* supra. That same person could have served as the victim in both count one and count two. See *State* v. *Greco,* 216 Conn. 282, 579 A.2d 84 (1990). Therefore, in the present case, the defendant was sufficiently apprised of the charges against him since he was aware of the name of at least one robbery victim and had access to the statements of several other patrons in the gambling club on the night of the robbery, including patrons who had been playing cards.

Furthermore, the defendant has not demonstrated that the specific name of the victim or victims was necessary to his defense in this particular case or that he would have prepared his defense differently had he been provided with such information in the bill of particulars.[8] The focus of the defendant's case was that either the defendant was not present at the club on the night of the robbery or, alternatively, if he was, he did not shoot Clark.

[8] The dissent asserts that the name of the robbery victim in the felony murder count "was absolutely essential to the defendant's preparation of his case." Despite its rhetoric, however, and despite its gratuitous reference to our "pull[ing] Jones' name out of the grab bag," the dissenting opinion fails to provide any factual analysis of how the defendant was prejudiced in his preparation by the state's pleading deficiency when, through his examination of the state's attorney's file, he knew the names of all of the potential robbery victims. The defendant's defense was not that there was no robbery or killing, or that he participated in the robbery of one victim but not another, rather, his claim was that the state could not prove that he was a participant in the crime at all. Furthermore, the dissent's discussion of our reference to Judge Heiman's remarks is simply irrelevant to the issue

During the state's case-in-chief, the defendant's strategy was to discredit by cross-examination the only eyewitnesses who testified against him, namely, his accomplices Hofler and Gregg. When the defendant cross-examined Demon and Jones, the only witnesses who testified that they had been robbed, he did not attempt to discredit their testimony that they had been robbed, but instead attempted to show that they could not identify him as a participant in the crime because they had their heads down during the robbery.

In his defense, the defendant's witnesses focused on the felony murder and not the underlying robbery. Through his witnesses, who were primarily patrons at the gambling club on the night of the robbery, the defendant attempted to show that either they could not identify him or he did not match the description of the gunman. During closing argument, defense counsel never attacked the state's contention that a robbery took place or that Jones and Demon were robbed.

We conclude that under the facts of this case, the defendant was sufficiently apprised of the charge against him so that he was not prejudiced in his defense. Therefore, the defendant's right to be informed of the charges against him was not violated.

### III

The defendant's third claim is that the trial court improperly denied his motion to suppress evidence seized as a result of a stop and search of a vehicle, in violation of the fourth amendment to the United States

of prejudice. The only purpose of that reference was to describe the defendant's argument that those remarks in effect amended the state's information. The defendant made that argument in the context of his claim of insufficiency of evidence under the felony murder count, and it had nothing to do with the issue of whether the defendant was prejudiced by the state's failure to name the robbery victim or victims.

constitution.[9] The state claims that the stop and search of the vehicle was constitutionally permissible under *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). We agree with the state.

The trial court found the following facts underlying this claim. On October 14, 1988, at approximately 10:06 p.m., six days after the robbery of the gambling club, Officer Emmett Hibson of the West Haven police department received a call that a holdup had just occurred at the Mazon Mobil gas station on the Boston Post Road at the corner of Farwell Street in West Haven, that $75 had been taken and that the suspect was a black male. Officer Ronald Zuk, the desk sergeant, relayed this information and a description of the perpetrator to the police cars in the field. The description of the perpetrator broadcast by Zuk was that of a black male, about five feet nine inches tall, with a brown leather jacket. He further broadcast that the perpetrator had used a handgun that looked like a .357 magnum, had gotten into an approximately 1978 light yellow Cadillac with something in the passenger window, and that there were four people in the vehicle. There was no mention in the broadcast of the race or sex of the other people in the vehicle.

Sergeant John Morris received the first radio report from Zuk and parked his police car on the sidewalk at the corner of Derby Avenue and Forrest Road, which is approximately two miles from the Mazon Mobil gas

[9] Since the defendant has not provided an independent analysis under the state constitution, we limit our analysis to the federal constitution. *State* v. *Lewis,* 220 Conn. 602, 608 n.3, 600 A.2d 1330 (1991); *State* v. *Joly,* 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991). We, therefore, have no occasion to determine whether the principles of *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), apply under our state constitution, a determination that the author of the concurring opinion has apparently already made.

station. Some time before 10:15 p.m., Morris observed a 1970s model yellow Cadillac pass by his location. From his vantage point he could see the entire passenger side of the vehicle. He observed what he thought to be four black males as the occupants. As the vehicle passed by Morris, he saw a sun screen in the rear passenger window of the vehicle. Morris began to follow the Cadillac and shortly thereafter he pulled the vehicle over because of the similarities between Zuk's broadcast and the vehicle he was following. He radioed headquarters that it "looks like four black males."

Officer Joseph Perno and another officer soon arrived at the scene in separate police cars. Using the public address system in his car, Perno ordered the occupants to vacate the Cadillac and to proceed to the trunk area and put their hands on the trunk. Three occupants alighted from the vehicle and proceeded to the rear of the vehicle. Perno then got out of his police car with gun drawn and approached the rear passenger door that had been left open at his request. He noticed a mound of clothing that, in his opinion, was large enough to hide a person, and ordered any other person inside the Cadillac to exit. He received no response. Perno and the other officer then conducted a pat down search of the three men. While patting down the defendant, Perno felt what in his opinion were bullets for a large caliber gun.

After notifying the other officers to watch the occupants, Perno returned to the rear passenger door to determine whether there was a fourth person hiding under the mound of clothing or whether there was a weapon within the reach of the occupants. At that time, none of the occupants was handcuffed and the defendant was standing next to the rear passenger door and within reach of the rear seat. Perno then leaned into the rear seat area of the Cadillac, pulled the mound of clothing toward him and uncovered an unzipped gym

bag in which he saw the butt of a handgun. Upon leaning further into the vehicle he saw the cutoff end of a rifle. Perno then leaned forward toward the front seat and observed on the floor a coffin scale, glassine envelopes and a bottle of manitol, a cutting agent for cocaine. Perno's search lasted a matter of seconds.

The occupants were then arrested for possession of weapons in a motor vehicle and possession of drug paraphernalia, and were handcuffed. The defendant's pockets were emptied, revealing, among other things, .38 caliber bullets. No money was found. The suspects were then transported to the gas station where witnesses made positive identifications. Perno radioed Morris from the gas station requesting a description of the jackets on the floor of the Cadillac. Morris responded that there was a brown leather jacket. Perno responded "Roger. Bingo."

At trial, the state introduced as exhibits the weapons found in the search of the vehicle as those used by the defendant and his accomplices in the robbery at the gambling club. The defendant filed a motion to suppress the evidence. The trial court concluded that Morris had a reasonable and articulable suspicion to stop the Cadillac under *Terry* v. *Ohio,* supra. The court then concluded that Perno's pat down of the defendant and limited search of the car did not exceed the scope of an investigative stop and was authorized by *Michigan* v. *Long,* supra.

"The fourth amendment to the federal constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides in relevant part that [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." (Internal quotation marks omitted.) *State* v. *Floyd,* 217 Conn. 73, 79–80, 584 A.2d 1157 (1991). Cer-

tain seizures are reasonable under the fourth amendment even in the absence of probable cause if there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime. *Florida* v. *Royer,* 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *Terry* v. *Ohio,* supra, 24; *State* v. *Lamme,* 216 Conn. 172, 184, 579 A.2d 484 (1990); *State* v. *Anderson,* 24 Conn. App. 438, 441, 589 A.2d 372, cert. denied, 219 Conn. 903, 593 A.2d 130 (1991).

Once a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative "stop" of the suspect to confirm or dispel his suspicions and may "frisk" the suspect to determine if the person is carrying a weapon. *Terry* v. *Ohio,* supra; *State* v. *Federici,* 179 Conn. 46, 51, 425 A.2d 916 (1979); *State* v. *Acklin,* 171 Conn. 105, 112–13, 368 A.2d 212 (1976). In *Michigan* v. *Long,* supra, 1049, the United States Supreme Court held that an officer conducting a *Terry* stop of an automobile may search the passenger compartment of the automobile for weapons, limited to areas where the weapon might be hidden, if the officer reasonably believes the suspect is potentially dangerous. During the course of such a search, the officer may legitimately uncover incriminatory evidence that establishes probable cause to arrest the suspect. *State* v. *Acklin,* supra, 113. That is precisely what happened in the present case.

The determination of whether a reasonable and articulable suspicion exists involves a two-part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct. See *State* v. *Cofield,* 220 Conn. 38, 44, 595 A.2d 1349 (1991). "The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts." (Internal quotation marks omitted.) Id.; see *State* v. *Lasher,* 190 Conn. 259,

267, 460 A.2d 970 (1983). Under the circumstances of this case, we conclude that the facts available to the detaining officers at the time were sufficient to justify the investigative stop and subsequent search of the passenger compartment.

Regarding the initial stop of the vehicle, we conclude that Morris had a reasonable and articulable suspicion that at least one of the occupants in the vehicle had recently committed the robbery of the gas station and, therefore, he was authorized to conduct a *Terry* stop of the vehicle. The vehicle matched the description broadcast over the radio in that it was a light yellow,[10] 1970s vintage Cadillac with something in the rear passenger window. In addition, the officer thought he saw four black males in the car, matching the description broadcast over the police radio of the number of occupants in the vehicle and the race of the perpetrator. Finally, the vehicle was sighted less than ten minutes and two miles from the crime scene.[11] These points of comparison established a reasonable and articulable suspicion to stop the vehicle. See 3 W. LaFave, Search and Seizure (2d Ed. 1987) § 9.3 (d), pp. 465–66.

The subsequent frisk of the defendant and search of the passenger compartment were also authorized under *Terry* and *Long*. Under *Terry,* an officer is justified in conducting a frisk if he reasonably believes the suspect may be armed and dangerous. In the present case, the officers had been informed that the robber had displayed a handgun during the robbery. Thus, they reasonably believed that the occupants may have been

---

[10] The vehicle was actually a light green color but the trial court determined that under the mercury vapor street lights the vehicle had more of a light yellow color.

[11] " 'Proximity in time and place of the stop to the crime is highly significant' in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion." *State* v. *Aillon,* 202 Conn. 385, 400, 521 A.2d 555 (1987), quoting *State* v. *Aversa,* 197 Conn. 685, 691, 501 A.2d 370 (1985).

armed and dangerous. Under *Long,* the officers were authorized to conduct a search of the passenger compartment to search for weapons. The search was particularly warranted in the present case because Perno believed that a fourth occupant might have been hiding under a mound of clothing.[12] That posed an additional threat to the officers, especially if a weapon had been left inside. Also, Perno felt what he believed were bullets on the defendant's person. That further aroused his suspicion that a gun may have been in the vehicle. Once Perno discovered the weapons and drug paraphernalia, he had probable cause to arrest the suspects.

The defendant argues that once the police stopped the vehicle, they were obligated to investigate further by determining whether the physical features of one of the occupants matched the description of the perpetrator. In the present case, reasonable suspicion was established based on the color, model and vintage of the vehicle, the proximity of time and location of the vehicle to the crime scene, the number of occupants in the vehicle and their race, and the sun screen in the rear passenger window. The physical features of the perpetrator were never broadcast to the officers in the field except for his height and race, which the police presumably corroborated when the occupants alighted from the vehicle.

The defendant also contends that the police should have attempted to determine, much earlier than they did, if there was a brown leather jacket in the vehicle like the one worn by the perpetrator and broadcast over

---

[12] The defendant argues that the search of the passenger compartment was not for the officers' protection but was instead a pretextual search for evidence. He contends that four jackets cannot hide a human being. Whether the search was pretextual or whether the jackets could have hidden a person are questions of fact for the trial court and will not be reversed unless clearly erroneous. We conclude that the trial court's findings are not clearly erroneous.

the police radio. It is true that the description of a brown leather jacket formed part of the basis for the establishment of a reasonable and articulable suspicion in the present case. The police, however, are not required to confirm every description of the perpetrator that is broadcast over the radio. "What must be taken into account is the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable . . . ." 3 W. LaFave, supra. "Moreover, account must be taken of the possibility that by . . . efforts of concealment some aspects of the description may no longer be applicable." Id., p. 466. This principle is particularly true in the present case since a jacket can easily be removed and, in fact, had been removed. See, e.g., *State* v. *Aversa*, 197 Conn. 685, 692–93, 501 A.2d 370 (1985) (neither person in car stopped had on blue sweatshirt robber was said to be wearing but they could have removed sweatshirt). The fact that none of the occupants was wearing a brown leather jacket did not destroy the officers' reasonable and articulable suspicion that one of the occupants may have committed the robbery.

Furthermore, the defendant's contention that the police should have secured further identification is contrary to the primary concern for the police officers' safety. "When the officer has a reasonable belief that the individual whose suspicious behavior he is investigating . . . is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (Internal quotation marks omitted.) *Michigan* v. *Long,* supra, 1047. Once a reasonable suspicion was established, the officers were justified in con-

ducting the protective frisk of the occupants and search of the passenger compartment of the vehicle before securing further positive identification of the physical features of the perpetrator or of the brown leather jacket.

The defendant further claims that in this case, as in *State* v. *Federici,* 179 Conn. 46, 425 A.2d 916 (1979), the police made no attempt to match the clothing of the defendant to that of the perpetrator until after they had conducted a search without probable cause. Specifically, the defendant appears to claim that the later identification of the brown leather jacket in the vehicle after the search could not establish probable cause at the time the search was conducted and, therefore, that the evidence seized during the search was inadmissible under *Federici. Federici,* however, is distinguishable from the present case.

This case, unlike *Federici,* is guided by *Long,* which was decided after *Federici.* In *Federici,* the police conducted a search of a vehicle without probable cause. We concluded that the more detailed description of the clothing given to the officers after the search had been conducted could not establish probable cause because the officers were required to establish probable cause before the search was conducted. *State* v. *Federici,* supra, 58. *Long* subsequently established, however, that once the police have reasonable and articulable suspicion, they are authorized to conduct a protective search of the passenger compartment of a vehicle. Therefore, in the present case, the police were authorized to conduct a search of the passenger compartment with less than probable cause.

## IV

The defendant's final claim is that the trial court improperly failed to instruct the jury that the general intent to commit the homicidal act is an element of

felony murder. We disagree. The evidence at trial indicated that Clark had grabbed the defendant's wrists and a struggle for the gun had ensued. During their struggle, two shots were fired and both men fell to the floor. Thereafter, the defendant pushed Clark off of him, fired a third shot into Clark's chest, and ran out of the club.

The defendant requested the court to charge the jury as follows: "The fourth element of the crime of felony murder is that the accused, Rodney Kyles, must have had the general intent to fire the shots that proximately caused the death of Mr. Clark. The crime of felony murder is a crime of commission rather than omission. . . . The causing of death in the present case is alleged as a 'shooting by a gun.' Such allegation is an act of commission requiring affirmative action. To some extent all crimes of affirmative action require something in the way of a mental element—*at least the intention to make the bodily movement* which constitutes the act which the crime requires. . . . The state has the burden to prove beyond a reasonable doubt that *Rodney Kyles intended to make the bodily movements that resulted in the shooting* of Mr. Clark. If . . . the gun may have been discharged in the struggle because of the pressure put on the wrists of the gunman by Mr. Clark or because of the struggle, then you must find the defendant . . . not guilty because the movements of the hands and fingers that resulted in the shooting were not voluntary." (Emphasis added.)

"In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, that a death was caused in the course of and in furtherance of that felony." (Internal quotation marks omitted.) *State* v. *Hernandez,* 204 Conn. 377, 386–87, 528 A.2d 794 (1987). Intent to cause death is not an element of the crime of felony murder.

Id., 386; *State* v. *Castro*, 196 Conn. 421, 429, 493 A.2d 223 (1985). Adopting the defendant's contention would inject into the felony murder statute an element that is not there and has never been there. There is no requirement under § 53a-54c, nor was there any requirement under the common law, that the state must prove that the defendant had the general intent to "make the bodily movements that resulted in the shooting." The state must simply prove all the elements of the underlying felony and then prove that the death was in the course of and in furtherance of that felony. The trial court instructed the jury properly on those elements.[13]

The defendant is misguided in his reliance on *State* v. *DiBattista*, 110 Conn. 549, 560, 148 A. 664 (1930), for the proposition that at common law a struggle over a revolver was a mitigating circumstance of felony murder. In *DiBattista*, the defendant was charged in the indictment with deliberate and premeditated first degree murder, not felony murder. The defendant claimed that a robbery fatality occurred over the struggle for a gun and, therefore, he did not have the intent to cause death required for a first degree murder conviction. The trial court made a factual determination, however, that there had been no struggle and that the defendant had simply shot the victim in the head. This court adopted the trial court's finding of fact and, therefore, concluded that the state had proven, as charged, the required intent to cause death. Thus, *DiBattista* does not stand for the proposition, as the defendant here suggests, that a struggle for a weapon may ren-

---

[13] The defendant, during the trial, framed this general intent issue in terms of proximate causation. The defendant claimed that Clark's act of struggling for the gun was an unforeseeable and abnormal response to the robbery situation and, therefore, the defendant did not proximately cause the death of Clark. Not only was a struggle for the gun foreseeable; see 2 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 7.5, p. 215; but the trial court gave a proper instruction to the jury on the issue of causation.

der the homicidal act involuntary, thereby establishing an extenuating circumstance of felony murder.[14]

Our conclusion is consistent with the purpose underlying the felony murder statute, namely, to punish those "whose conduct brought about an unintended death in the commission or attempted commission of a felony." 2 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 7.5, p. 206. The felony murder rule includes accidental, unintended deaths. Indeed, we have noted "that crimes against the person like robbery, rape and common-law arson and burglary are, in common experience, *likely to involve danger to life in the event of resistance by the victim* . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *MacFarlane,* 188 Conn. 542, 553, 450 A.2d 374 (1982); see *State* v. *Rossi,* 132 Conn. 39, 44, 42 A.2d 354 (1945), overruled in part on other grounds, *State* v. *Tomassi,* 137 Conn. 113, 123, 75 A.2d 67 (1950). "Robberies by armed robbers no doubt are even more likely to result in unintended deaths than are arsons. Often it is the victim of the robbery who is accidently killed. The armed robber committing or attempting a robbery whose loaded gun . . . is discharged accidentally when the robber and [another person] are struggling for the gun, is guilty of felony murder when the [person] is thus killed." 2 W. LaFave & A. Scott, supra, § 7.5, p. 215; see *People* v. *Manriquez,* 188 Cal. 602, 206 P. 63 (1922); *Commonwealth* v. *Lessner,* 274 Pa. 108, 118 A. 24 (1922).

[14] Furthermore, it can hardly be said that the defendant's actions in the present case were involuntary. The defendant voluntarily drove to the gambling club and participated in the robbery with a loaded handgun. This is not a case where the defendant was under duress or his participation in the robbery was otherwise involuntary. "[T]he relevant conduct that created the substantial and unjustifiable risk to [Clark was] the whole course of [the defendant's] conduct . . . and not just his action in pulling the trigger." (Citation omitted; internal quotation marks omitted.) *State* v. *Edwards,* 214 Conn. 57, 66, 570 A.2d 193 (1990).

It is true that the common law definition of felony murder has been narrowed in scope in most jurisdictions. See 2 W. LaFave & A. Scott, supra, § 7.5, p. 206. Connecticut has also narrowed the common law definition of felony murder pursuant to § 53a-54c by limiting the statute's applicability to certain dangerous types of underlying felonies, by excepting deaths of "one of the participants" from the statute, by allowing certain affirmative defenses and by requiring that the death arise "in the course of and in furtherance of such crime or of flight therefrom." General Statutes § 53a-54c. Nowhere in the statute, however, is there a further requirement of a general intent to commit the homicidal act. If the legislature had intended to place further limitations on the common law definition of felony murder, it would have so stated in the statute. Indeed, "[t]he felony murder statute does not require that the defendant commit the homicidal act . . . ." *State* v. *Flanders,* 214 Conn. 493, 501, 572 A.2d 983 (1990). A defendant may be liable "if a death is caused by *any* participant in the underlying felony." (Emphasis in original.) Id., 505.

The judgment is affirmed.

In this opinion PETERS, C. J., CALLAHAN and GLASS, Js., concurred.

BERDON, J., dissenting and concurring. I agree that it was improper for the trial court to deny the defendant's motion for a supplemental bill of particulars, but I disagree with the majority's conclusion that the denial did not prejudice the defendant. Furthermore, although I concur with the majority's holding that the *Terry* type[1] search of the defendant's vehicle was permissible under the federal constitution; *Michigan* v. *Long,*

[1] *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); I note that the defendant failed to raise a similar claim pursuant to our state constitution.

I

The subject of the motion for the bill of particulars—the name of the victim of the underlying robbery for the felony murder count—was absolutely essential to the defendant's preparation of his case. To support its conclusion that there was no prejudice, the majority relies on the defendant's access to the state's entire file, which had been provided in response to a discovery request. The state's file, however, contained the names of approximately eleven persons who were at the gambling club and, therefore, any one of them could have been the victim of the underlying robbery. Simply put, the defendant could have robbed Robert Clark, Norman Arnold, Robert Jones, Charles Demon, Thomson Lyn, David Crenshaw, Bonnie Thomas, Levis Thompson, Robert Saunders, "Herbie" or "Lope," all of whom were named as being in the gambling club at the time of the incident.

If the state had wanted to rely on the robbery of any one of the patrons in the gambling club as the predicate felony, it could have simply stated its intention in the first count of the information. The failure to order the state to name the victim of the underlying felony deprived the defendant of his constitutional rights. "The sixth amendment to the United States constitution and article first, § 8 of the Connecticut constitution guarantee a criminal defendant the right to be informed of the nature and cause of the charges against him with sufficient precision to enable him to meet them at trial. *State* v. *Laracuente,* 205 Conn. 515, 518, 534 A.2d 882 (1987), cert. denied, 485 U.S. 1036, 108 S. Ct. 1598, 99 L. Ed. 2d 913 (1988)." (Internal quotation

marks omitted.) *State* v. *Spigarolo,* 210 Conn. 359, 381, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989).

The majority relies on *State* v. *Frazier,* 194 Conn. 233, 237, 478 A.2d 1013 (1984), for the proposition that the defendant's access to the state's file negated any prejudice. Its reliance, however, is misplaced. In *Frazier,* the defendant was seeking the "mode and manner" of how the crime was committed. Presumably, the state's file adequately explained *one* such mode and manner. In this case, although Jones' statement in the state's file presumably alleges that he had been robbed, the defendant would have had to guess whether the state intended to prove that Jones was the victim of the underlying felony, or whether the victim in the first count had been one of the other ten gamblers present in the club. Indeed, it is the majority that pulls Jones' name out of the grab bag of all the gamblers present and concludes that he had been the robbery victim.

The majority's decision is even more puzzling because it initially states that the defendant could not rely on Judge Heiman's conclusion from the bench that Clark had been the robbery victim in the felony murder count for his motion for a judgment of acquittal before Judge McWeeny.[2] Then, in holding that the defendant was not prejudiced by the denial of his motion for a supplemental bill of particulars, the majority concludes that

---

[2] The majority opinion states: "The defendant's interpretation of count one essentially treats Judge Heiman's remarks as having orally amended the state's information when, in fact, such an action is ordinarily within the province of the state. See Practice Book §§ 623 and 624. The first count charged only that the defendant 'did commit robbery.' It made no mention of the names of the victims or how many persons may have been robbed. Contrary to the defendant's position, Judge McWeeny did not acquiesce in Judge Heiman's interpretation and, in his instructions to the jury, Judge McWeeny stated that the state need not prove that Clark was the robbery victim in count one."

extraneous information available to the defendant provided him with actual notice of the robbery victim or victims. To support this latter proposition, the majority cites as authority *State* v. *Beaulieu,* 164 Conn. 620, 626, 325 A.2d 263 (1973), which held that the *trial court's* explanation of the charge precluded a prejudice claim on the failure to furnish a bill of particulars. Furthermore, in *State* v. *Williams,* 220 Conn. 385, 390, 599 A.2d 1053 (1991), we recently affirmed a criminal defendant's conviction for felony murder because we concluded that the defendant had sufficient notice of the state's intention pursuant to the amended information to proceed under a theory of accessorial liability, based, in part, upon the trial court's intimation that accessorial liability was a theory in the case. Therefore, we are left with the confusing and conflicting holdings of this court, wherein the defendant is sometimes required to rely on the trial court's assessment of an information, while not being able to rely on it at other times.

I believe that the defendant was prejudiced by the state's failure to inform him of the alleged robbery victim in the felony murder count and I would reverse and remand the case for a new trial.

## II

The majority of the Supreme Court of the United States in *Michigan* v. *Long,* supra, 1049–50, held "that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. See [*Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)]."

Nevertheless, the dissent in *Long* strongly points out that the court unreasonably extended *Terry* and that "the Court is simply continuing the process of distorting *Terry* beyond recognition and forcing it into service as an unlikely weapon against the Fourth Amendment's fundamental requirement that searches and seizures be based on probable cause." *Michigan* v. *Long,* supra, 1054 (Brennan, J., dissenting). To be sure, commentators have also been critical of *Long.* "The Court unfortunately took a most expansive view of what constitutes danger in the context of a *Terry* stop of a person in an automobile. As a result, *Long* can easily be read by lower courts so inclined as conferring on police the power to make extensive vehicle searches without probable cause incident to virtually any lawful stopping of a vehicle. It is thus quite fair to say, as the dissenters warn, that 'the implications of the Court's decision are frightening.' " 3 W. LaFave, Search and Seizure (2d Ed. 1987) § 9.4 (e), p. 531.

Although I believe the present case to be close, the probability of bullets on the defendant's person, the open doors of the vehicle and the police having to manage three suspects including the defendant, leads me to conclude that, under *Long,* a *Terry* type search of the vehicle was permissible. We must apply *Long* because we are duty bound to follow the majority of the United States Supreme Court when deciding federal law.

I feel compelled, however, to point out that the defendant did not raise issues of privacy under our state constitution[3] either at trial or in this court. "In the area

---

[3] The Connecticut constitution, article first, § 7 provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

Furthermore, article first, § 9 provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." *Horton* v. *Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977). We have demonstrated our willingness to afford the citizens of this state greater privacy protection under our state constitution. For example, in *State* v. *Marsala,* 216 Conn. 150, 579 A.2d 58 (1990), we rejected under article first, § 7 of our state constitution the good faith exception to the exclusionary rule that was adopted by the United States Supreme Court in *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

The New York Court of Appeals has squarely addressed the issue of whether its state constitution allows the intrusion deemed constitutional in *Long.* In *People* v. *Torres,* 74 N.Y.2d 224, 543 N.E.2d 61, 544 N.Y.S.2d 796 (1989), a stop and frisk of two suspects revealed no immediate danger to the officers' safety. Nevertheless, one officer reached into the suspects' vehicle and searched a closed shoulder bag. Although the New York court acknowledged *Long,* it held that the search violated article first, § 12 of its state constitution, which is identical to the fourth amendment

to the federal constitution, because the New York constitution affords greater protection to individual privacy rights than does the federal constitution. Id., 226.

Because the defendant did not raise the issue, we must leave to another day whether *Long* can pass muster under the Connecticut constitution.

Accordingly, I respectfully dissent in part and concur in part.