[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO SUPPRESS EVIDENCE (10/29/96);MOTION TO SUPPRESS STATEMENTS (10/29/96); ANDAMENDED MOTION TO DISMISS (10/29/96)
This case involves the arrest of the defendant, Jancis Fuller, on June 29, 1995, on the charges of murder and attempted murder. The defendant claims that this arrest was without probable cause, that a subsequent search of her car was also conducted without probable cause and that as a result of these unauthorized actions on the part of the police any evidence seized from the car and any statements taken from her after her CT Page 56 arrest should be suppressed. The defendant further argues that based on the evidence before the Court, the charges should be dismissed.
The facts known to the police at the time of the arrest were that the Groton Town Police Department had received a call from the residence of Superior Court Judge Robert Leuba, 585 High Street, Mystic, Connecticut, on June 29, 1995, at approximately 4:14 a.m. The call reported that someone was shooting at or throwing rocks at the home at this address.
Officers who responded found evidence that shots had been fired at the house. The police located four spent .32-caliber bullet casings in the roadway at the end of the Leuba driveway. These shell casings were found in close proximity to one another. Further examination of the scene revealed that two shots had struck the home in the area of the homeowner's bedroom. One of the bullets had made a hole in the bedroom window. Another bullet had struck the wall of the bedroom but had not penetrated into the bedroom. A bullet fragment was found inside the bedroom. The bullet that did not penetrate the bedroom wall was in line with the bed itself.
The police, including Lt. Joseph Illinger of the Groton Town Police Department, interviewed Mrs. Hope Leuba, and she stated that she and her husband were asleep in their bedroom when she heard what sounded like gunshots at about 3:50 a.m. She looked out the bedroom window at the head of her bed and saw two muzzle flashes and heard two shots coming from the end of her driveway. Mrs. Leuba told the police she saw the outline of a person at the end of the driveway and that the person she saw slowly turned and walked in a northerly direction away from her driveway towards Sandy Hollow and Bindloss Roads.
The police further learned from Mrs. Leuba that her family had been having problems with Jancis Fuller, a woman who had grown up in the area and whose father, Harvey Fuller, still lived on Bindloss Road, which is within walking distance and to the north of the Leuba driveway.
The problems the Leubas were having with Ms. Fuller were described as occurring for a number of years and the complainants believed that Ms. Fuller had a great deal of animosity towards the Leuba family. CT Page 57
While Lt. Illinger was at the Leuba residence on the morning of June 29, 1995, he received additional information from Sgt. Holloway of the Groton Town Police Department. Sgt. Holloway informed Lt. Illinger that three weeks prior to that date, Officer Crowley of the Groton Town Police Department had checked on the "well being" of Mr. Harvey Fuller at 4 Bindloss Road in Mystic. Mr. Fuller told Officer Crowley that he had recently argued with his daughter, that she was having problems and blamed all her problems on the Leuba family. Mr. Fuller told Officer Crowley that he believed his daughter possessed or had access to a gun and that he was concerned about this especially with relation to the Leuba family's safety.
On the morning of June 29, 1995, Detective LaBelle of the Groton Town Police Department went to Number 4 Bindloss Road, Mystic, Connecticut, the address of the defendant's father, and spoke with Mr. Fuller. Mr. Fuller told the detective that the evening before at approximately 5:30 p.m., his daughter had come to his address and appeared to be upset. Ms. Fuller was accompanied by two companions, a Richard Rocco and another man named Ben Leonardi. Mr. Fuller told the detective that his daughter appeared to be upset with the Leubas, and while at his house that evening, his daughter had blamed the Leubas for all her problems. She had requested the men with her to go to the Leubas' home and "beat a confession out of him." In addition, during the course of the evening, Jancis Fuller stated that she wished the Leubas were dead.
On June 29, 1995, Lt. Illinger and Detective Conley went to the residence of Harvey Fuller at approximately 11:00 a.m. Mr. Fuller told the police that the previous evening his daughter Jancis was extremely upset while at his home and she had been yelling and screaming. He stated that his daughter was blaming Judge Leuba for all her problems. Mr. Fuller stated that his daughter had been blaming the Leubas for her problems for years and that on this occasion she was very agitated to the point of screaming. Mr. Fuller continued that his daughter suffered from psychiatric problems and had been treated at a mental hospital on two occasions. Mr. Fuller stated that his daughter left his home at 6:15 p.m. on June 28, 1995.
While Lt. Illinger and Detective Conley were present at the home of Mr. Fuller, the phone rang and it was Richard Rocco. Detective Conley knew Mr. Rocco and spoke with him on the phone. Detective Conley also knew Ms. Fuller and had seen her on a CT Page 58 number of occasions with Mr. Rocco. Mr. Rocco stated on the phone to Detective Conley that he was looking for Jancis Fuller, that she had left his apartment and Mr. Rocco thought Ms. Fuller might be at her father's house. Mr. Rocco went on to say in their conversation that on the previous day, Jancis Fuller had been very upset with Judge Leuba and that Jancis Fuller had not slept well that night. Mr. Rocco said that at 3:30 a.m. on June 29, 1995, Ms. Fuller had gotten up, got dressed and left the apartment of Mr. Rocco. Mr. Rocco told the police at that time that she had been absent for about an hour, that Ms. Fuller had returned to his apartment and that he had seen her at 9:00 a.m.
Detective Conley testified that just prior to his conversation on the phone with Mr. Rocco, he had heard Mr. Fuller state that on the previous evening, Mr. Fuller heard Jancis Fuller telling Mr. Rocco that she wanted him to "take her back to get the gun."
During the morning of June 29, 1995, the police determined it took approximately eleven minutes to get from Judge Leuba's house in Mystic to Mr. Rocco's apartment on West Street in New London.
After leaving Mr. Fuller's home, Lt. Illinger and Detective Conley eventually proceeded to New London and the home of Richard Rocco on West Street in that city. At approximately 1:00 p.m. at Mr. Rocco's apartment, Mr. Rocco expanded on what he had stated while on the phone to Detective Conley. Mr. Rocco told the police that on June 28, 1995, he had accompanied Jancis Fuller to a pretrial conference on a criminal case that was pending as the result of her earlier arrest in Waterford, Connecticut. Mr. Rocco stated that Jancis Fuller had become very upset with the proposals made to her by a judge at the pretrial conference. Mr. Rocco told the police that Ms. Fuller blamed the Leubas for all her problems, that Ms. Fuller remained upset with the Leubas and would not calm down. Mr. Rocco stated that Ms. Fuller wanted Mr. Rocco to go to Judge Leuba's house and "get a confession from him." Mr. Rocco said that Ms. Fuller was crying, shaking, not stable, and never calmed down the whole afternoon.
During the interview at Mr. Rocco's apartment, Mr. Rocco stated that at approximately 6:30 p.m. on June 28, 1995, Mr. Rocco and Jancis Fuller got a ride to Mr. Rocco's apartment on West Street in New London. Mr. Rocco told the police that Ms. Fuller never calmed down the whole evening. That at 11:30 p.m. on CT Page 59 June 28, 1995, Ms. Fuller went to bed but woke up crying at which point he tried to calm her. Mr. Rocco told the police that at 3:30 a.m. on June 29, 1995, he heard Jancis Fuller in his apartment. The defendant was out of bed, dressed and told him she was going out to get coffee. In this interview, Mr. Rocco stated at 6:00 a.m. he realized she was back at his apartment.
Mr. Rocco said he was sure of the 3:30 a.m. time and that he believed Ms. Fuller was driving a 1995 Toyota Corolla, color blue, with a Connecticut registration number 129.JLJ, which was a car she owned.
At approximately 1:50 p.m., Detective Conley and Lt. Illinger were in a police car with Mr. Rocco when they saw Jancis Fuller's car in a parking lot of the New London Public Library on Huntington Street. The police parked near her car and they could see that Ms. Fuller was in the driver's seat and alone. Detective Conley testified that he recognized Ms. Fuller, that he believed based on what he knew, that she had done the shooting, that she might still be armed and might try to use a gun against the officers.
As the police approached her car, they saw Ms. Fuller reach into the console area of her car. Detective Conley who was on the driver's side of her car told Ms. Fuller to put her hands where they could be seen by the police. Ms. Fuller complied, and in her hands were a set of keys.
Detective Conley at this point ordered the defendant out of the car. When Ms. Fuller exited the car, she stated that "the Leubas sent you here." Detective Conley testified that statement was not in response to any questions he had asked him and that subsequent to this statement, Ms. Fuller went on to quickly describe a number of other complaints against the Leubas. Ms. Fuller claimed the Leubas had been "persecuting her for twenty years." Ms. Fuller was at this point shaking and upset and was arrested by Detective Conley and placed in the rear seat of the police vehicle.
In addition, both Detective Conley and Lt. Illinger testified that while outside of Ms. Fuller's car, they had observed in a bag behind the driver's seat containing what appeared to be a leather strap that was attached to what looked like a holster and a plastic bag with the logo of a firearms manufacturer. The detectives testified that in a search of the CT Page 60 bag, they recovered two holsters and a plastic bag with the Bianci logo on it. The officers testified that Bianci is a firearms manufacturer. The officers testified that the search was limited to the areas where a weapon might be found because they knew they were going to secure Ms. Fuller's auto and apply for a search warrant to examine the entire car.
Dealing with the issues in the order in which they present themselves, the first question that must be answered is whether or not the police had probable cause to arrest Ms. Fuller.
"Probable cause" to arrest requires more than mere suspicion and exists when the facts and circumstances within the officer's knowledge, and of which he has trustworthy information, are sufficient to justify the reasonable belief of a prudent person that an offense has been committed, and that the arrestee is the perpetrator. See Michigan v. DeFillippo, 443 U.S. 31, 37
(1979) (citing prior United States Supreme Court cases); State v.Velez, 215 Conn. 667, 672 (1990) (discussing probable cause to make a warrantless arrest); State v. Penland, 174 Conn. 153,155-56, cert. denied, 436 U.S. 906 (1978) (noting that this standard will govern warrantless felony arrests on "reasonable grounds" under Connecticut General Statutes § 54-1f); Statev. Hunter, 27 Conn. App. 128, 133-34 (1992). Moreover, this "information" may stem from "the collective knowledge of the law enforcement organization [of which the arresting officer is a member];" State v. Acklin, 171 Conn. 105, 111 (1976); State v.Holder, 18 Conn. App. 184, 188 (1989); State v. Carey,13 Conn. App. 69, 73 (1987); from that of another police department, seeState v. Hoffler, 174 Conn. 452, 459 (1978); or from a putative victim or an eyewitness. Acklin, 171 Conn. at 112.
"In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."Brinegar v. United States, 388 U.S. 160, 175.
Applying these standards to the facts of this case, it is apparent that the police had more than enough information to arrest Ms. Fuller as she sat in her car in the library parking lot.
The search of the car is based upon the same facts that CT Page 61 supported the arrest, but slightly different standards exist by which the actions of the police are tested.
Warrantless searches and seizures of motor vehicles by law enforcement officers are not unreasonable when supported by a probable cause belief that the same contain objects subject to seizure, the rationales being the inherent mobility of and the lesser or lower expectations of privacy in vehicles than in stationary structures, California v. Carney, 471 U.S. 386, 390-93
(1985); State v. Badgett, 200 Conn. 412, 428-29, cert. denied,479 U.S. 940 (1986); State v. Kolinsky, 182 Conn. 533, 537-38
(1980), cert. denied, 451 U.S. 973 (1981); State v. Januszewski,182 Conn. 142, 155-56 (1980), cert. denied, 453 U.S. 922 (1981);State v. Patterson, 31 Conn. App. 278, 308 (1993); the exception covers every part of a vehicle, lawfully stopped on probable cause, and its contents, inclusive of closed containers, so long as they may contain the object of the search. United States v.Ross, 456 U.S. 798, 825 (1982).
Once again, the facts known to the police as they approached Ms. Fuller's car in the parking lot supported probable cause to search that vehicle. The analysis of these facts, however, need not end at this point.
Investigatory Terry-type stops (named after Terry v.Ohio, 392 U.S. 1 (1960)) of motor vehicles by law enforcement officers are constitutionally permissible if certain criteria are met. The fact that at the very least these circumstances were present at the time the police encountered Ms. Fuller is admitted in the defendant's brief.
During the temporary duration of an investigatory stop, the detaining officer will be permitted to conduct a warrantless area search of the passenger compartment of the vehicle to uncover weapons if the officer possesses an articulable and objectively reasonable belief that the occupant or occupants are potentially dangerous to himself and others, as the case may be. See Michigan v. Long, 463 U.S. 1032, 1049-52 and n. 16 (1983) (permitting vehicle "frisks," pursuant to an objective test for reasonableness, under the Terry doctrine.
Therefore, even if the facts known by the police at the library parking lot did not form the basis for probable cause, the police were acting legally when they searched the car. CT Page 62
Now, if during the course of such a search, the officers legitimately uncovered incriminating evidence that supports probable cause to arrest, they may do so. State v. Kyles,221 Conn. 660, 661-664. The statements and actions of Ms. Fuller and the other observations made by the police prior to her arrest added to the facts known by the police and also supported a finding of probable cause to search and arrest.
Additionally, if the probable cause to arrest Ms. Fuller existed after she was taken from the car, the subsequent search of her auto was valid even if not supported by probable cause.
In the case of an automobile, the proper scope of a search incident to the lawful custodial arrest of the occupant of an automobile extends to the passenger compartment of the vehicle, as well as the contents of any open or closed containers, including glove compartments, found within the passenger compartment. For purposes of search-and-seizure analysis, the passenger compartment of an automobile encompasses all space reachable without exiting the vehicle.
Moreover, the justification for the incidental search continues after the occupant is removed from the vehicle and is still at the scene. State v. Badgett, 200 Conn. 412, 427 (1986).
In conclusion, it is difficult to imagine how the police could have acted in any other responsible way. They had reliable information that a felony had occurred and every bit of that information pointed to Jancis Fuller. The subsequent stop, arrest and search of Ms. Fuller and her car were permissible under any one of a number of legal justifications, all of which were present in this situation.
For these reasons, the defendant's motion to suppress evidence and to suppress statements are denied. Based upon these conclusions, it necessarily follows that the defendant's motion to dismiss is also denied.
Thomas V. O'Keefe, Jr., J. CT Page 63